UNITED STATES *v.* ROBINSON

No. 72–936. Argued October 9, 1973—Decided December 11, 1973

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, WHITE, BLACKMUN, and POWELL, JJ., joined. POWELL, J., filed a concurring opinion, *post,* p. 237. MARSHALL, J., filed a dissenting opinion, in which DOUGLAS and BRENNAN, JJ., joined, *post,* p. 238.

*Allan A. Tuttle* argued the cause for the United States. With him on the brief were *Solicitor General Griswold, Assistant Attorney General Petersen, Deputy Solicitor General Lacovara,* and *Jerome M. Feit.*

*Joseph V. Gartlan, Jr.,* argued the cause for respondent. With him on the brief was *Dorothy Sellers.**

MR. JUSTICE REHNQUIST delivered the opinion of the Court.

Respondent Robinson was convicted in United States District Court for the District of Columbia of the possession and facilitation of concealment of heroin in violation of 26 U. S. C. § 4704 (a) (1964 ed.), and 21 U. S. C. § 174 (1964 ed.). He was sentenced to concurrent terms of imprisonment for these offenses. On his appeal to the Court of Appeals for the District of Columbia Cir-

---

*Briefs of *amici curiae* urging reversal were filed by *Evelle J. Younger,* Attorney General, *Edward A. Hinz, Jr.,* Chief Assistant Attorney General, *William E. James,* Assistant Attorney General, and *Robert R. Granucci* and *Sanford Svetcov,* Deputy Attorneys General, for the State of California; by *William J. Scott,* Attorney General, and *James B. Zagel* and *Jayne A. Carr,* Assistant Attorneys General, for the State of Illinois; and by *Fred E. Inbau, Alan S. Ganz, Frank Carrington, Glen R. Murphy, Wayne W. Schmidt, Geoffrey M. Alprin,* and *Scott R. Schoenfeld* for Americans for Effective Law Enforcement, Inc., et al.

*Melvin L. Wulf* and *Joel M. Gora* filed a brief for the American Civil Liberties Union as *amicus curiae* urging affirmance.

cuit, that court first remanded the case to the District Court for an evidentiary hearing concerning the scope of the search of respondent's person which had occurred at the time of his arrest. 145 U. S. App. D. C. 46, 447 F. 2d 1215 (1971). The District Court made findings of fact and conclusions of law adverse to respondent, and he again appealed. This time the Court of Appeals en banc reversed the judgment of conviction, holding that the heroin introduced in evidence against respondent had been obtained as a result of a search which violated the Fourth Amendment to the United States Constitution. 153 U. S. App. D. C. 114, 471 F. 2d 1082 (1972). We granted certiorari, 410 U. S. 982 (1973), and set the case for argument together with *Gustafson* v. *Florida*, No. 71–1669, *post*, p. 260, also decided today.

On April 23, 1968, at approximately 11 p. m., Officer Richard Jenks, a 15-year veteran of the District of Columbia Metropolitan Police Department, observed the respondent driving a 1965 Cadillac near the intersection of 8th and C Streets, N. E., in the District of Columbia. Jenks, as a result of previous investigation following a check of respondent's operator's permit four days earlier, determined there was reason to believe that respondent was operating a motor vehicle after the revocation of his operator's permit. This is an offense defined by statute in the District of Columbia which carries a mandatory minimum jail term, a mandatory minimum fine, or both. D. C. Code Ann. § 40–302 (d) (1967).

Jenks signaled respondent to stop the automobile, which respondent did, and all three of the occupants emerged from the car. At that point Jenks informed respondent that he was under arrest for "operating after revocation and obtaining a permit by misrepresentation." It was assumed by the Court of Appeals, and is conceded by the respondent here, that Jenks had

probable cause to arrest respondent, and that he effected a full-custody arrest.[1]

In accordance with procedures prescribed in police department instructions,[2] Jenks then began to search

---

[1] The Court of Appeals noted that there was a difference in the presentation of the facts in the various proceedings that were conducted in the District Court. Counsel for respondent on appeal stressed that respondent had a record of two prior narcotics convictions, and suggested that Officer Jenks may have been aware of that record through his investigation of criminal records, while Jenks was checking out the discrepancies in the birthdates on the operator's permit and on the Selective Service card that had been given to him for examination when he had confronted the respondent on the previous occasion. Respondent argued below that Jenks may have used the subsequent traffic violation arrest as a mere pretext for a narcotics search which would not have been allowed by a neutral magistrate had Jenks sought a warrant. The Court of Appeals found that Jenks had denied he had any such motive, and for the purposes of its opinion accepted the Government's version of that factual question, since even accepting that version it still found the search involved to be unconstitutional. 153 U. S. App. D. C. 114, 120 n. 3, 471 F. 2d 1082, 1088 n. 3. We think it is sufficient for purposes of our decision that respondent was lawfully arrested for an offense, and that Jenks' placing him in custody following that arrest was not a departure from established police department practice. See n. 2, *infra*. We leave for another day questions which would arise on facts different from these.

[2] The Government introduced testimony at the evidentiary hearing upon the original remand by the Court of Appeals as to certain standard operating procedures of the Metropolitan Police Department. Sergeant Dennis C. Donaldson, a Metropolitan Police Department Training Division instructor, testified that when a police officer makes "a full custody arrest," which he defined as one where an officer "would arrest a subject and subsequently transport him to a police facility for booking," the officer is trained to make a full "field type search":

"Q. Would you describe the physical acts the officer is instructed to perform with respect to this field search in a full custody arrest situation?

"A. (Sgt. Donaldson). Basically, it is a thorough search of the

respondent. He explained at a subsequent hearing that he was "face-to-face" with the respondent, and "placed [his] hands on [the respondent], my right-hand to his

individual. We would expect in a field search that the officer completely search the individual and inspect areas such as behind the collar, underneath the collar, the waistband of the trousers, the cuffs, the socks and shoes. Those are the areas we would ask a complete thorough search of.

"Q. What are the instructions in a field type search situation when an officer feels something on the outside of the garment?

"A. If it is a full custody arrest and he is conducting a field search, we expect him to remove anything and examine it to determine exactly what it is.

"THE COURT: That is a full custody arrest. What is the last part of it?

"THE WITNESS: In conducting a field search, which is done any time there is a full custody arrest, we expect the officer to examine anything he might find on the subject.

"THE COURT: Would he do the same thing in a pat-down search?

"THE WITNESS: If he could determine in his pat-down or frisk by squeezing that it was not, in fact, a weapon that could be used against him, then we don't instruct him to go further.

"THE COURT: But in a field search, even though he may feel something that he believes is not a weapon, is he instructed to take it out?

"THE WITNESS: Yes, sir."

Sergeant Donaldson testified that officers are instructed to examine the "contents of all of the pockets" of the arrestee in the course of the field search. It was stated that these standard operating procedures were initiated by the police department "[p]rimarily, for [the officer's] own safety and, secondly, for the safety of the individual he has placed under arrest and, thirdly, to search for evidence of the crime." While the officer is instructed to make a full field search of the person of the individual he arrests, he is instructed, and police department regulations provide, that in the case of a full-custody arrest for driving after revocation, "areas beyond [the arrestee's] immediate control should not be searched because there is no probable cause to believe that the vehicle contains fruits, instrumentalities, contraband or evidence of the offense of driving after revocation." Those regulations also provide that in the case

left breast like this (demonstrating) and proceeded to pat him down thus [with the right hand]." During this patdown, Jenks felt an object in the left breast pocket of the heavy coat respondent was wearing, but testified that he "couldn't tell what it was" and also that he "couldn't actually tell the size of it." Jenks then reached into the pocket and pulled out the object, which turned out to be a "crumpled up cigarette package." Jenks testified that at this point he still did not know what was in the package:

> "As I felt the package I could feel objects in the package but I couldn't tell what they were. . . . I knew they weren't cigarettes."

The officer then opened the cigarette pack and found 14 gelatin capsules of white powder which he thought to be, and which later analysis proved to be, heroin. Jenks then continued his search of respondent to completion, feeling around his waist and trouser legs, and examining the remaining pockets. The heroin seized from the respondent was admitted into evidence at the trial which resulted in his conviction in the District Court.

The opinion for the plurality judges of the Court of Appeals, written by Judge Wright, the concurring opinion of Chief Judge Bazelon, and the dissenting opinion of Judge Wilkey, concurred in by three judges, gave careful and comprehensive treatment to the authority of a police officer to search the person of one

---

of some traffic offenses, including the crime of operating a motor vehicle after revocation of an operator's permit, the officer shall make a summary arrest of the violator and take the violator, in custody, to the station house for booking. D. C. Metropolitan Police Department General Order No. 3, series 1959 (Apr. 24, 1959).

Such operating procedures are not, of course, determinative of the constitutional issues presented by this case.

who has been validly arrested and taken into custody. We conclude that the search conducted by Jenks in this case did not offend the limits imposed by the Fourth Amendment, and we therefore reverse the judgment of the Court of Appeals.

I

It is well settled that a search incident to a lawful arrest is a traditional exception to the warrant requirement of the Fourth Amendment. This general exception has historically been formulated into two distinct propositions. The first is that a search may be made of the *person* of the arrestee by virtue of the lawful arrest. The second is that a search may be made of the area within the control of the arrestee.

Examination of this Court's decisions shows that these two propositions have been treated quite differently. The validity of the search of a person incident to a lawful arrest has been regarded as settled from its first enunciation, and has remained virtually unchallenged until the present case. The validity of the second proposition, while likewise conceded in principle, has been subject to differing interpretations as to the extent of the area which may be searched.

Because the rule requiring exclusion of evidence obtained in violation of the Fourth Amendment was first enunciated in *Weeks* v. *United States,* 232 U. S. 383 (1914), it is understandable that virtually all of this Court's search-and-seizure law has been developed since that time. In *Weeks,* the Court made clear its recognition of the validity of a search incident to a lawful arrest:

> "What then is the present case? Before answering that inquiry specifically, it may be well by a process of exclusion to state what it is not. It is not an assertion of the right on the part of the

Government, always recognized under English and American law, to search the person of the accused when legally arrested to discover and seize the fruits or evidences of crime. This right has been uniformly maintained in many cases. 1 Bishop on Criminal Procedure, § 211; Wharton, Crim. Plead. and Practice, 8th ed., § 60; *Dillon* v. *O'Brien and Davis*, 16 Cox C. C. 245." *Id.*, at 392.

*Agnello* v. *United States,* 269 U. S. 20 (1925), decided 11 years after *Weeks*, repeats the categorical recognition of the validity of a search incident to lawful arrest:

"The right without a search warrant contemporaneously to search persons lawfully arrested while committing crime and to search the place where the arrest is made in order to find and seize things connected with the crime as its fruits or as the means by which it was committed, as well as weapons and other things to effect an escape from custody, is not to be doubted." *Id.*, at 30.

Throughout the series of cases in which the Court has addressed the second proposition relating to a search incident to a lawful arrest—the permissible area beyond the person of the arrestee which such a search may cover—no doubt has been expressed as to the unqualified authority of the arresting authority to search the person of the arrestee. *E. g., Carroll* v. *United States,* 267 U. S. 132 (1925); *Marron* v. *United States,* 275 U. S. 192 (1927); *Go-Bart Co.* v. *United States,* 282 U. S. 344 (1931); *United States* v. *Lefkowitz,* 285 U. S. 452 (1932); *Harris* v. *United States,* 331 U. S. 145 (1947); *Trupiano* v. *United States,* 334 U. S. 699 (1948); *United States* v. *Rabinowitz,* 339 U. S. 56 (1950); *Preston* v. *United States,* 376 U. S. 364 (1964); *Chimel* v. *California,* 395 U. S. 752 (1969). In *Chimel,* where the Court overruled *Rabinowitz* and *Harris* as to the area

of permissible search incident to a lawful arrest, full recognition was again given to the authority to search the person of the arrestee:

> "When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its conceal-ment or destruction." 395 U. S., at 762–763.

Three years after the decision in *Chimel, supra,* we upheld the validity of a search in which heroin had been taken from the person of the defendant after his arrest on a weapons charge, in *Adams* v. *Williams,* 407 U. S. 143 (1972), saying:

> "Under the circumstances surrounding Williams' possession of the gun seized by Sgt. Connolly, the arrest on the weapons charge was supported by probable cause, and the search of his person and of the car incident to that arrest was lawful." *Id.,* at 149.

Last Term in *Cupp* v. *Murphy,* 412 U. S. 291, 295 (1973), we again reaffirmed the traditional statement of the authority to search incident to a valid arrest.

Thus the broadly stated rule, and the reasons for it, have been repeatedly affirmed in the decisions of this Court since *Weeks* v. *United States, supra,* nearly 60 years ago. Since the statements in the cases speak not simply in terms of an exception to the warrant require-ment, but in terms of an affirmative authority to search, they clearly imply that such searches also meet the Fourth Amendment's requirement of reasonableness.

## II

In its decision of this case, the Court of Appeals decided that even after a police officer lawfully places a suspect under arrest for the purpose of taking him into custody, he may not ordinarily proceed to fully search the prisoner. He must, instead, conduct a limited frisk of the outer clothing and remove such weapons that he may, as a result of that limited frisk, reasonably believe and ascertain that the suspect has in his possession. While recognizing that *Terry* v. *Ohio,* 392 U. S. 1 (1968), dealt with a permissible "frisk" incident to an investigative stop based on less than probable cause to arrest, the Court of Appeals felt that the principles of that case should be carried over to this probable-cause arrest for driving while one's license is revoked. Since there would be no further evidence of such a crime to be obtained in a search of the arrestee, the court held that only a search for weapons could be justified.

*Terry* v. *Ohio, supra,* did not involve an arrest for probable cause, and it made quite clear that the "protective frisk" for weapons which it approved might be conducted without probable cause. *Id.,* at 21–22, 24–25. This Court's opinion explicitly recognized that there is a "distinction in purpose, character, and extent between a search incident to an arrest and a limited search for weapons."

> "The former, although justified in part by the acknowledged necessity to protect the arresting officer from assault with a concealed weapon, *Preston* v. *United States,* 376 U. S. 364, 367 (1964), is also justified on other grounds, *ibid.,* and can therefore involve a relatively extensive exploration of the person. A search for weapons in the absence of probable cause to arrest, however, must, like any other search, be strictly circumscribed by the exigen-

cies which justify its initiation. *Warden* v. *Hayden,* 387 U. S. 294, 310 (1967) (MR. JUSTICE FORTAS, concurring). Thus it must be limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby, and may realistically be characterized as something less than a 'full' search, even though it remains a serious intrusion.

". . . An arrest is a wholly different kind of intrusion upon individual freedom from a limited search for weapons, and the interests each is designed to serve are likewise quite different. An arrest is the initial stage of a criminal prosecution. It is intended to vindicate society's interest in having its laws obeyed, and it is inevitably accompanied by future interference with the individual's freedom of movement, whether or not trial or conviction ultimately follows. The protective search for weapons, on the other hand, constitutes a brief, though far from inconsiderable, intrusion upon the sanctity of the person." *Id.,* at 25–26 (footnote omitted).

*Terry,* therefore, affords no basis to carry over to a probable-cause arrest the limitations this Court placed on a stop-and-frisk search permissible without probable cause.

The Court of Appeals also relied on language in *Peters* v. *New York,* 392 U. S. 40, 66 (1968), a companion case to *Terry.* There the Court held that the police officer had authority to search Peters because he had probable cause to arrest him, and went on to say:

"[T]he incident search was obviously justified 'by the need to seize weapons and other things which might be used to assault an officer or effect an escape, as well as by the need to prevent the

destruction of evidence of the crime.' *Preston* v. *United States*, 376 U. S. 364, 367 (1964). Moreover, it was reasonably limited in scope by these purposes. Officer Lasky did not engage in an unrestrained and thorough-going examination of Peters and his personal effects." *Id.*, at 67.

It is, of course, possible to read the second sentence from this quotation as imposing a novel limitation on the established doctrine set forth in the first sentence. It is also possible to read it as did Mr. Justice Harlan in his opinion concurring in the result:

"The second possible source of confusion is the Court's statement that 'Officer Lasky did not engage in an unrestrained and thorough-going examination of Peters and his personal effects.' [392 U. S.], at 67. Since the Court found probable cause to arrest Peters, and since an officer arresting on probable cause is entitled to make a very full incident search, I assume that this is merely a factual observation. As a factual matter, I agree with it." *Id.*, at 77 (footnote omitted).

We do not believe that the Court in *Peters* intended in one unexplained and unelaborated sentence to impose a novel and far-reaching limitation on the authority to search the person of an arrestee incident to his lawful arrest. While the language from *Peters* was quoted with approval in *Chimel* v. *California*, 395 U. S., at 764, it is preceded by a full exposition of the traditional and unqualified authority of the arresting officer to search the arrestee's person. *Id.*, at 763. We do not believe that either *Terry* or *Peters*, when considered in the light of the previously discussed statements of this Court, justified the sort of limitation upon that authority which the Court of Appeals fashioned in this case.

230 .

## III

Virtually all of the statements of this Court affirming the existence of an unqualified authority to search incident to a lawful arrest are dicta. We would not, therefore, be foreclosed by principles of *stare decisis* from further examination into history and practice in order to see whether the sort of qualifications imposed by the Court of Appeals in this case were in fact intended by the Framers of the Fourth Amendment or recognized in cases decided prior to *Weeks*. Unfortunately such authorities as exist are sparse. Such common-law treatises as Blackstone's Commentaries and Holmes' Common Law are simply silent on the subject. Pollock and Maitland, in their History of English Law, describe the law of arrest as "rough and rude" before the time of Edward I, but do not address the authority to search incident to arrest. 2 F. Pollock & F. Maitland, The History of English Law 582 (2d ed. 1909).

The issue was apparently litigated in the English courts in *Dillon* v. *O'Brien,* 16 Cox C. C. 245 (Exch. Ireland, 1887), cited in *Weeks* v. *United States, supra,* There Baron Palles said:

> "But the interest of the State in the person charged being brought to trial in due course necessarily extends, as well to the preservation of material evidence of his guilt or innocence, as to his custody for the purpose of trial. His custody is of no value if the law is powerless to prevent the abstraction or destruction of this evidence, without which a trial would be no more than an empty form. But if there be a right to production or preservation of this evidence, I cannot see how it can be enforced otherwise than by capture." 16 Cox C. C., at 250.

*Spalding* v. *Preston,* 21 Vt. 9 (1848), represents an early holding in this country that evidence may be seized from one who is lawfully arrested. In *Closson* v. *Morrison,* 47 N. H. 482 (1867), the Court made the following statement:

> "[W]e think that an officer would also be justified in taking from a person whom he had arrested for crime, any deadly weapon he might find upon him, such as a revolver, a dirk, a knife, a sword cane, a slung shot, or a club, though it had not been used or intended to be used in the commission of the offence for which the prisoner had been arrested, and even though no threats of violence towards the officer had been made. A due regard for his own safety on the part of the officer, and also for the public safety, would justify a sufficient search to ascertain if such weapons were carried about the person of the prisoner, or were in his possession, and if found, to seize and hold them until the prisoner should be discharged, or until they could be otherwise properly disposed of. *Spalding* v. *Preston,* 21 Vt. 9, 16.
>
> "So we think it might be with money or other articles of value, found upon the prisoner, by means of which, if left in his possession, he might procure his escape, or obtain tools, or implements, or weapons with which to effect his escape. We think the officer arresting a man for crime, not only may, but frequently should, make such searches and seizures; that in many cases they might be reasonable and proper, and courts would hold him harmless for so doing, when he acts in good faith, and from a regard to his own or the public safety, or the security of his prisoner." *Id.,* at 484–485.

Similarly, in *Holker* v. *Hennessey*, 141 Mo. 527, 42 S. W. 1090 (1897), the Supreme Court of Missouri said:

"Generally speaking, in the absence of a statute, an officer has no right to take any property from the person of the prisoner except such as may afford evidence of the crime charged, or means of identifying the criminal, or may be helpful in making an escape." *Id.*, at 539, 42 S. W., at 1093.

Then Associate Judge Cardozo of the New York Court of Appeals summarized his understanding of the historical basis for the authority to search incident to arrest in these words:

"The basic principle is this: Search of the person is unlawful when the seizure of the body is a trespass, and the purpose of the search is to discover grounds as yet unknown for arrest or accusation [citation omitted]. Search of the person becomes lawful when grounds for arrest and accusation have been discovered, and the law is in the act of subjecting the body of the accused to its physical dominion.

"The distinction may seem subtle, but in truth it is founded in shrewd appreciation of the necessities of government. We are not to strain an immunity to the point at which human nature rebels against honoring it in conduct. The peace officer empowered to arrest must be empowered to disarm. If he may disarm, he may search, lest a weapon be concealed. The search being lawful, he retains what he finds if connected with the crime." *People* v. *Chiagles*, 237 N. Y. 193, 197, 142 N. E. 583, 584 (1923).

While these earlier authorities are sketchy, they tend to support the broad statement of the authority to

search incident to arrest found in the successive decisions of this Court, rather than the restrictive one which was applied by the Court of Appeals in this case. The scarcity of case law before *Weeks* is doubtless due in part to the fact that the exclusionary rule there enunciated had been first adopted only 11 years earlier in Iowa; but it would seem to be also due in part to the fact that the issue was regarded as well settled.[3]

The Court of Appeals in effect determined that the *only* reason supporting the authority for a *full* search incident to lawful arrest was the possibility of discovery of evidence or fruits.[4] Concluding that there could be no evidence or fruits in the case of an offense such as that with which respondent was charged, it held that any protective search would have to be limited by the conditions laid down in *Terry* for a search upon less than probable cause to arrest. Quite apart from the fact that *Terry* clearly recognized the distinction between the two types of searches, and that a different rule governed one than governed the other, we find additional reason to disagree with the Court of Appeals.

---

[3] See T. Taylor, Two Studies in Constitutional Interpretation 44–45 (1969).

Taylor suggests that there "is little reason to doubt that search of an arrestee's person and premises is as old as the institution of arrest itself." *Id.*, at 28. "Neither in the reported cases nor the legal literature is there any indication that search of the person of an arrestee, or the premises in which he was taken, was ever challenged in England until the end of the nineteenth century . . . [and] the English courts gave the point short shrift." *Id.*, at 29.

[4] Where the arrest is made for a crime for which it is reasonable to believe that evidence exists, the Court of Appeals recognizes that "warrantless intrusion into the pockets of the arrestee to discover such evidence is reasonable under the 'search incident' exception." 153 U. S. App. D. C., at 127, 471 F. 2d, at 1095. The court then states that the officer may use this "reasonable [evidentiary] intrusion" to simultaneously look for weapons. *Ibid.*

234

The justification or reason for the authority to search incident to a lawful arrest rests quite as much on the need to disarm the suspect in order to take him into custody as it does on the need to preserve evidence on his person for later use at trial. *Agnello* v. *United States,* 269 U. S. 20 (1925); *Abel* v. *United States,* 362 U. S. 217 (1960). The standards traditionally governing a search incident to lawful arrest are not, therefore, commuted to the stricter *Terry* standards by the absence of probable fruits or further evidence of the particular crime for which the arrest is made.

Nor are we inclined, on the basis of what seems to us to be a rather speculative judgment, to qualify the breadth of the general authority to search incident to a lawful custodial arrest on an assumption that persons arrested for the offense of driving while their licenses have been revoked are less likely to possess dangerous weapons than are those arrested for other crimes.[5] It is scarcely open to doubt that the danger to an officer is far greater in the case of the extended exposure which

---

[5] Such an assumption appears at least questionable in light of the available statistical data concerning assaults on police officers who are in the course of making arrests. The danger to the police officer flows from the fact of the arrest, and its attendant proximity, stress, and uncertainty, and not from the grounds for arrest. One study concludes that approximately 30% of the shootings of police officers occur when an officer stops a person in an automobile. Bristow, Police Officer Shootings—A Tactical Evaluation, 54 J. Crim. L. C. & P. S. 93 (1963), cited in *Adams* v. *Williams,* 407 U. S. 143, 148 (1972). The Government in its brief notes that the Uniform Crime Reports, prepared by the Federal Bureau of Investigation, indicate that a significant percentage of murders of police officers occurs when the officers are making traffic stops. Brief for the United States 23. Those reports indicate that during January–March 1973, 35 police officers were murdered; 11 of those officers were killed while engaged in making traffic stops. *Ibid.*

follows the taking of a suspect into custody and transporting him to the police station than in the case of the relatively fleeting contact resulting from the typical *Terry*-type stop. This is an adequate basis for treating all custodial arrests alike for purposes of search justification.

But quite apart from these distinctions, our more fundamental disagreement with the Court of Appeals arises from its suggestion that there must be litigated in each case the issue of whether or not there was present one of the reasons supporting the authority for a search of the person incident to a lawful arrest. We do not think the long line of authorities of this Court dating back to *Weeks,* or what we can glean from the history of practice in this country and in England, requires such a case-by-case adjudication. A police officer's determination as to how and where to search the person of a suspect whom he has arrested is necessarily a quick *ad hoc* judgment which the Fourth Amendment does not require to be broken down in each instance into an analysis of each step in the search. The authority to search the person incident to a lawful custodial arrest, while based upon the need to disarm and to discover evidence, does not depend on what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect. A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification. It is the fact of the lawful arrest which establishes the authority to search, and we hold that in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a "reasonable" search under that Amendment.

236

## IV

The search of respondent's person conducted by Officer Jenks in this case and the seizure from him of the heroin, were permissible under established Fourth Amendment law. While thorough, the search partook of none of the extreme or patently abusive characteristics which were held to violate the Due Process Clause of the Fourteenth Amendment in *Rochin* v. *California,* 342 U. S. 165 (1952). Since it is the fact of custodial arrest which gives rise to the authority to search,[6] it is of no moment that Jenks did not indicate any subjective fear of the respondent or that he did not himself suspect that respondent was armed.[7] Having in the course of a lawful search come upon the crumpled package of cigarettes, he was entitled to inspect it; and when his inspection revealed the heroin capsules, he was entitled to seize them as "fruits, instrumentalities, or contraband" probative of criminal conduct. *Harris* v. *United States,* 331 U. S., at 154–155; *Warden* v. *Hayden,* 387 U. S. 294, 299, 307 (1967); *Adams* v. *Williams,* 407 U. S., at 149.

[6] The opinion of the Court of Appeals also discussed its understanding of the law where the police officer makes what the court characterized as "a routine traffic stop," *i. e.,* where the officer would simply issue a notice of violation and allow the offender to proceed. Since in this case the officer did make a full-custody arrest of the violator, we do not reach the question discussed by the Court of Appeals.

[7] The United States concedes that "in searching respondent, [Officer Jenks] was not motivated by a feeling of imminent danger and was not specifically looking for weapons." Brief for the United States 34. Officer Jenks testified, "I just searched him [Robinson]. I didn't think about what I was looking for. I just searched him." As previously noted, Officer Jenks also testified that upon removing the cigarette package from the respondent's custody, he was still unsure what was in the package, but that he knew it was not cigarettes.

The judgment of the Court of Appeals holding otherwise is

*Reversed.*

MR. JUSTICE POWELL, concurring.*

Although I join the opinions of the Court, I write briefly to emphasize what seems to me to be the essential premise of our decisions.

The Fourth Amendment safeguards the right of "the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." These are areas of an individual's life about which he entertains legitimate expectations of privacy. I believe that an individual lawfully subjected to a custodial arrest retains no significant Fourth Amendment interest in the privacy of his person. Under this view the custodial arrest is the significant intrusion of state power into the privacy of one's person. If the arrest is lawful, the privacy interest guarded by the Fourth Amendment is subordinated to a legitimate and overriding governmental concern. No reason then exists to frustrate law enforcement by requiring some independent justification for a search incident to a lawful custodial arrest. This seems to me the reason that a valid arrest justifies a full search of the person, even if that search is not narrowly limited by the twin rationales of seizing evidence and disarming the arrestee.[1] The search incident to arrest

---

*This opinion also applies to No. 71–1669, *Gustafson* v. *Florida, post,* p. 260.

[1] The Court of Appeals for the Ninth Circuit aptly stated this rationale in *Charles* v. *United States,* 278 F. 2d 386, 388–389 (1960):

"Power over the body of the accused is the essence of his arrest; the two cannot be separated. To say that the police may curtail the liberty of the accused but refrain from impinging upon the sanctity of his pockets except for enumerated reasons is to

is reasonable under the Fourth Amendment because the privacy interest protected by that constitutional guarantee is legitimately abated by the fact of arrest.[2]

MR. JUSTICE MARSHALL, with whom MR. JUSTICE DOUGLAS and MR. JUSTICE BRENNAN join, dissenting.

Certain fundamental principles have characterized this Court's Fourth Amendment jurisprudence over the years. Perhaps the most basic of these was expressed by Mr. Justice Butler, speaking for a unanimous Court in *Go-Bart Co.* v. *United States,* 282 U. S. 344 (1931): "There is no formula for the determination of reasonableness. Each case is to be decided on its own facts and circumstances." *Id.,* at 357. As we recently held: "The constitutional validity of a warrantless search is preeminently the sort of question which can only be decided in the concrete factual context of the individual case." *Sibron* v. *New York,* 392 U. S. 40, 59 (1968). And the intensive, at times painstaking, case-by-case analysis characteristic of our Fourth Amendment decisions bespeaks our "jealous regard for maintaining the integrity of individual rights." *Mapp* v. *Ohio,* 367 U. S. 643, 647

---

ignore the custodial duties which devolve upon arresting authorities. Custody must of necessity be asserted initially over whatever the arrested party has in his possession at the time of apprehension. Once the body of the accused is validly subjected to the physical dominion of the law, inspections of his person, regardless of purpose, cannot be deemed unlawful, unless they violate the dictates of reason either because of their number or their manner of perpetration." (Citation omitted.)

[2] In *Gustafson, post,* p. 260, the petitioner conceded the validity of the custodial arrest, although that conclusion was not as self-evident as in *Robinson.* *Gustafson* would have presented a different question if the petitioner could have proved that he was taken into custody only to afford a pretext for a search actually undertaken for collateral objectives. But no such question is before us.

(1961). See also *Weeks* v. *United States,* 232 U. S. 383, 393 (1914).

In the present case, however, the majority turns its back on these principles, holding that "the fact of the lawful arrest" always establishes the authority to conduct a full search of the arrestee's person, regardless of whether in a particular case "there was present one of the reasons supporting the authority for a search of the person incident to a lawful arrest." *Ante,* at 235. The majority's approach represents a clear and marked departure from our long tradition of case-by-case adjudication of the reasonableness of searches and seizures under the Fourth Amendment. I continue to believe that "[t]he scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances." *Terry* v. *Ohio,* 392 U. S. 1, 21 (1968). Because I find the majority's reasoning to be at odds with these fundamental principles, I must respectfully dissent.

I

On April 19, 1968, Officer Richard Jenks stopped a 1965 Cadillac driven by respondent at the intersection of 9th and U Streets, N. W., in the District of Columbia, for what was called a "routine spot check." At that time, Officer Jenks examined respondent's temporary operator's permit, automobile registration card, and Selective Service classification card. Although he permitted respondent to go on his way, Officer Jenks pursued a discrepancy he had noted between the "1938" date of birth given on the operator's permit and the "1927" date of birth given on the Selective Service card. A check of police traffic records showed that an operator's

permit issued to one Willie Robinson, Jr., born in 1927, had been revoked, and that a temporary operator's permit had subsequently been issued to one Willie Robinson, born in 1938. The pictures on the revoked permit and on the application for the temporary permit were of the same man—the person stopped by Jenks for the routine check on April 19. Having investigated the matter himself in this fashion, it is clear that Officer Jenks had probable cause to believe that respondent had violated a provision of the District of Columbia Motor Vehicle Code making it unlawful for any person to operate a motor vehicle in the District during the period for which his operator's permit is revoked. D. C. Code Ann. § 40–302 (d) (1967).

Four days later, on April 23, 1968, while on duty in their patrol car, Officer Jenks and his partner saw respondent driving the same vehicle. They pulled up behind respondent's car and signaled it to stop. From all indications in the record, respondent immediately complied and brought his car to a stop alongside the curb, the officers parking their patrol car immediately behind his.

Respondent got out of his car and walked back toward the patrol car. Both Officer Jenks and his partner got out of the patrol car and started toward respondent's car. Officer Jenks asked respondent for his permit and registration card and, when shown the same permit respondent had given him four days earlier, informed respondent that he was under arrest for operating a motor vehicle after revocation of his operator's permit.

Jenks then began to search respondent. His normal procedure in conducting a search of an arrestee would be to "have him spread-eagle over a wall or something of that nature." But in Jenks' own words, "I think almost every search is different. It depends on the man's size and the nature of the crime." Since he had a substantial

height and weight advantage over respondent, and because the arrest was only for a traffic offense, Jenks chose instead to conduct the search face to face, in contrast to his normal practice.

The first step in the search was for Jenks to place both his hands on respondent's chest and begin to pat him down. During this patdown, Jenks felt something in the left breast pocket of respondent's heavy overcoat. Jenks later testified that he could not immediately tell what was in the pocket. The record does indicate, however, that the object did not feel like a gun and that Jenks had no particular indication it was a weapon of any kind.[1] Nonetheless, he reached into the pocket and took the object out. It turned out to be a crumpled-up cigarette package.

With the package now in his hands, Jenks could feel objects inside but could not tell what they were. It does not appear that Jenks had any reason to believe, or did in fact believe, that the objects were weapons of any sort. He nevertheless opened up the package and looked inside, thereby finding the gelatin capsules of heroin which were introduced against respondent at his trial for the possession and facilitation of concealment of heroin.

## II

Mr. Justice Jackson, writing for the Court in *Johnson* v. *United States*, 333 U. S. 10, 13–14 (1948), explained:

"The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies

---

[1] At the suppression hearing, Officer Jenks was shown a small derringer and was asked, after the gun was placed in a coat pocket, "whether or not it feels like the lump you felt in Mr. Robinson's pocket the night you arrested him?" Jenks answered that the object "does not feel the same" but rather felt "harder," "larger," and "[m]uch more suspicious."

> law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. . . . When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or government enforcement agent."

See also *Coolidge* v. *New Hampshire,* 403 U. S. 443, 449 (1971). The majority's fear of overruling the "quick *ad hoc* judgment" of the police officer is thus inconsistent with the very function of the Amendment—to ensure that the quick *ad hoc* judgments of police officers are subject to review and control by the judiciary.

In the vast majority of cases, the determination of when the right of privacy must reasonably yield to the right of search is required to be made by a neutral judicial officer before the search is conducted. See *Katz* v. *United States,* 389 U. S. 347, 356–357 (1967); *Agnello* v. *United States,* 269 U. S. 20, 33 (1925). The Constitution requires that "the deliberate, impartial judgment of a judicial officer . . . be interposed between the citizen and the police . . . ." *Wong Sun* v. *United States,* 371 U. S. 471, 481–482 (1963).

The requirement that the police seek prior approval of a search from a judicial officer is, no doubt, subject to "a few specifically established and well-delineated exceptions," *Katz* v. *United States, supra,* at 357; including searches of a moving vehicle, *Carroll* v. *United States,* 267 U. S. 132 (1925); searches in certain exigent circumstances, *Warden* v. *Hayden,* 387 U. S. 294, 298–299 (1967); *McDonald* v. *United States,* 335 U. S. 451, 454–455 (1948); and searches incident to a lawful

arrest, *Agnello* v. *United States, supra; Chimel* v. *California,* 395 U. S. 752 (1969). But because an exception is invoked to justify a search without a warrant does not preclude further judicial inquiry into the reasonableness of that search. It is the role of the judiciary, not of police officers, to delimit the scope of exceptions to the warrant requirement. "[T]he general requirement that a search warrant be obtained is not lightly to be dispensed with, and 'the burden is on those seeking [an] exemption [from the requirement] to show the need for it . . . .' " *Id.,* at 762, quoting *United States* v. *Jeffers,* 342 U. S. 48, 51 (1951). Exceptions to the warrant requirement are not talismans precluding further judicial inquiry whenever they are invoked, see *Coolidge* v. *New Hampshire, supra,* at 461, but rather are "jealously and carefully drawn." *Jones* v. *United States,* 357 U. S. 493, 499 (1958).

Carrying out our mandate of delineating the proper scope of the search-incident-to-arrest exception requires consideration of the purposes of that exception as they apply to the particular search that occurred in this case. See *Chimel* v. *California, supra,* at 762–763; *Preston* v. *United States,* 376 U. S. 364, 367 (1964). Yet the majority, rather than focusing on the facts of this case, places great emphasis on the police department order which instructed Officer Jenks to conduct a full search and to examine carefully everything he found whenever making an in-custody arrest. See *ante,* at 221 and n. 2. But this mode of analysis was explicitly rejected in *Sibron* v. *New York,* 392 U. S. 40 (1968). There both the defendant and the State urged that the principal issue before us was the constitutionality of a state statute which authorized the search there in question. We declined, however, to engage in what we viewed "as the abstract and unproductive exercise" of laying the words of the statute next to the Fourth Amendment "in an effort to determine whether the two are in some

sense compatible." *Id.*, at 59. "Our constitutional inquiry," we concluded, "would not be furthered here by an attempt to pronounce judgment on the words of the statute. We must confine our review instead to the reasonableness of the searches and seizures which underlie these two convictions." *Id.*, at 62.

The majority also suggests that the Court of Appeals reached a novel and unprecedented result by imposing qualifications on the historically recognized authority to conduct a full search incident to a lawful arrest. Nothing could be further from the truth, as the Court of Appeals itself was so careful to point out.

One need not go back to Blackstone's Commentaries, Holmes' Common Law, or Pollock & Maitland in search of precedent for the approach adopted by the Court of Appeals. Indeed, given the fact that mass production of the automobile did not begin until the early decades of the present century, I find it somewhat puzzling that the majority even looks to these sources for guidance on the only question presented in this case: the permissible scope of a search of the person incident to a lawful arrest for violation of a motor vehicle regulation. The fact is that this question has been considered by several state and federal courts, the vast majority of which have held that, absent special circumstances, a police officer has no right to conduct a full search of the person incident to a lawful arrest for violation of a motor vehicle regulation.

In *Barnes* v. *State,* 25 Wis. 2d 116, 130 N. W. 2d 264 (1964), for example, police officers stopped a car for a brake-light violation. Rather than simply issue a citation, the officers placed the driver under arrest. A full search of the driver's person was then conducted, including shining a flashlight into his overcoat pocket, disclosing a small quantity of marihuana and a package of cigarette papers. The Supreme Court of Wisconsin held

the search of the driver's pocket unreasonable. While expressly holding that where a traffic offender is actually arrested, as distinguished from being given a summons, it is reasonable for the arresting officer to search his person for weapons, nevertheless the court held it unreasonable to look inside the driver's overcoat pocket with a flashlight. "We cannot conceive," the court said, "that this aspect of the search was a legitimate search for weapons. . . . We reject the state's contention that any search of the person of one lawfully arrested is a valid search." *Id.*, at 126, 130 N. W. 2d, at 269.

In *State* v. *Curtis*, 290 Minn. 429, 190 N. W. 2d 631 (1971), police officers stopped a car which had defective taillights and which had made an illegal right turn. The officers decided to take the driver down to the station house and searched him for weapons before putting him in the squad car. One of the officers felt the outside of the driver's pockets. As in Robinson's case, the officer "detected some object but couldn't tell what it was. It did not feel like a gun or knife." *Id.*, at 430, 190 N. W. 2d, at 632. "Neither officer expressed any concern for his personal safety. There was no testimony that they suspected defendant of any other criminal activity or were aware of any dangerous propensities on his part." *Id.*, at 431, 190 N. W. 2d, at 633. Nevertheless the officer reached into the pocket, resulting in the discovery of a package of marihuana. The Minnesota Supreme Court held the search unlawful. While recognizing the "concern for the injuries and loss of life experienced by police officers in face-to-face confrontations with traffic offenders," the court held that "the validity of a search for weapons following a traffic arrest depends on whether the officer had reasonable grounds to believe a search was necessary for his own safety or to prevent an escape." *Id.*, at 436–437, 190 N. W. 2d, at 636, citing *Shelton*

v. *State*, 3 Md. App. 394, 399, 239 A. 2d 610, 613 (1968).

Of like import is the decision of the Oregon Supreme Court in *State* v. *O'Neal*, 251 Ore. 163, 444 P. 2d 951 (1968) (en banc). Here defendant's automobile was stopped because it had no rear license plate. When asked to produce an operator's license, the defendant produced a temporary operator's license issued to another person which had expired several years earlier. The officers then arrested defendant and placed him in the back seat of the police car. "One of the officers got in the police car and asked the defendant to remove his money from his wallet and give his wallet to the officer. The defendant did so and the officer took papers from the wallet and examined them. When the officer unfolded one piece of paper a half-smoked marijuana cigarette fell out." *Id.*, at 164–165, 444 P. 2d, at 952. The court held the search unlawful. Again, while recognizing the officer's right to conduct a search incident to arrest in order to protect the officer and deprive the prisoner of potential means of escape, the court held:

> "The search of the wallet obviously had nothing to do with the officers' safety. The defendant testified that the officers 'patted him down' before placing him in the police car. The officers did not remember whether they had or had not. In any event, it is difficult to see how defendant's wallet could have reasonably been believed to have contained a weapon." *Id.*, at 166, 444 P. 2d, at 953.

See also *People* v. *Marsh*, 20 N. Y. 2d 98, 228 N. E. 2d 783 (1967); *People* v. *Superior Court of Los Angeles County*, 7 Cal. 3d 186, 496 P. 2d 1205 (1972); *State* v. *Quintana*, 92 Ariz. 267, 376 P. 2d 130 (1962) (en banc); *People* v. *Zeigler*, 358 Mich. 355, 100 N. W. 2d 456 (1960). The Tenth Circuit has likewise stated that it is "in complete agreement with the prevailing federal and state authority

which condemns the search of persons and automobiles following routine traffic violations." *United States* v. *Humphrey,* 409 F. 2d 1055, 1058 (1969). See also *Amador-Gonzalez* v. *United States,* 391 F. 2d 308, 315 (CA5 1968) (Wisdom, J.).

Accordingly, I think it disingenuous for the Court to now pronounce that what precedents exist on the question "tend to support the broad statement of the authority to search incident to arrest found in the successive decisions of this Court, rather than the restrictive one which was applied by the Court of Appeals in this case." [2] *Ante,* at 232–233. It is disquieting, to say the least, to see the Court at once admit that "[v]irtually all of the statements of this Court affirming the existence of an unqualified authority to search incident to a lawful arrest are dicta" and concede that we are presented with an open question on which "further examination into history and practice" would be helpful, yet then conduct an examina-

---

[2] Even the Court's attempt to dip into the English common law is selective. The power to conduct a search incident to arrest was litigated in *Leigh* v. *Cole,* 6 Cox C. C. 329 (Oxford Circuit 1853), a civil case in which the plaintiff, a lawyer, was stopped while on the road and arrested by defendant superintendent of police. After the plaintiff was taken to the station house, a police constable searched him, at the defendant's direction, and a tobacco box and a piece of paper were taken from him. In instructing the jury, the learned judge stated: "With respect to searching a prisoner, there is no doubt that a man when in custody may so conduct himself, by reason of violence of language or conduct, that a police officer may reasonably think it prudent and right to search him, in order to ascertain whether he has any weapon with which he might do mischief to the person or commit a breach of the peace; but at the same time it is quite wrong to suppose that a general rule can be applied to such a case. Even when a man is confined for being drunk and disorderly, it is not correct to say that he must submit to the degradation of being searched, as the searching of such a person must depend upon all the circumstances of the case." *Id.,* at 332.

tion into prior practice which is not only wholly superficial, but totally inaccurate and misleading.

The majority's attempt to avoid case-by-case adjudication of Fourth Amendment issues is not only misguided as a matter of principle, but is also doomed to fail as a matter of practical application. As the majority itself is well aware, see *ante,* at 221 n. 1, the powers granted the police in this case are strong ones, subject to potential abuse. Although, in this particular case, Officer Jenks was required by police department regulations to make an in-custody arrest rather than to issue a citation, in most jurisdictions and for most traffic offenses the determination of whether to issue a citation or effect a full arrest is discretionary with the officer. There is always the possibility that a police officer, lacking probable cause to obtain a search warrant, will use a traffic arrest as a pretext to conduct a search. See, *e. g., Amador-Gonzalez* v. *United States, supra.* I suggest this possibility not to impugn the integrity of our police, but merely to point out that case-by-case adjudication will always be necessary to determine whether a full arrest was effected for purely legitimate reasons or, rather, as a pretext for searching the arrestee. "An arrest may not be used as a pretext to search for evidence." *United States* v. *Lefkowitz,* 285 U. S. 452, 467 (1932). See also *Jones* v. *United States,* 357 U. S., at 500; *Abel* v. *United States,* 362 U. S. 217, 226 and 230 (1960); *United States* v. *Rabinowitz,* 339 U. S. 56, 82 (1950) (Frankfurter, J., dissenting). Cf. *Chimel* v. *California,* 395 U. S., at 767–768.

III

The majority states that "[a] police officer's determination as to how and where to search the person of a suspect whom he has arrested is· necessarily a quick *ad hoc* judgment which the Fourth Amendment does not

require to be broken down in each instance into an analysis of each step in the search." [3] *Ante,* at 235. No precedent is cited for this broad assertion—not surprisingly, since there is none. Indeed, we only recently rejected such "a rigid all-or-nothing model of justification and regulation under the Amendment, [for] it obscures the utility of limitations upon the scope, as well as the initiation, of police action as a means of constitutional regulation. This Court has held in the past that a search which is reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity and scope." *Terry* v. *Ohio,* 392 U. S., at 17–18. As we there concluded, "in determining whether the seizure and search were 'unreasonable' our inquiry is a dual one—whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.,* at 19–20.

As I view the matter, the search in this case divides into three distinct phases: the patdown of respondent's coat pocket; the removal of the unknown object from the

---

[3] The majority's reference to the quick *ad hoc* judgment of the police officer may be read as an expression of doubt whether this kind of on-the-street police activity can effectively be controlled by court-imposed standards. This problem was discussed in *Terry* v. *Ohio,* 392 U. S. 1 (1968), where we recognized "the limitations of the judicial function in controlling the myriad daily situations in which policemen and citizens confront each other on the street." *Id.,* at 12. But as we concluded there, even though "[n]o judicial opinion can comprehend the protean variety of the street encounter, . . . courts still retain their traditional responsibility to guard against police conduct . . . which trenches upon personal security without the objective evidentiary justification which the Constitution requires. When such conduct is identified, it must be condemned by the judiciary and its fruits must be excluded from evidence in criminal trials." *Id.,* at 15.

pocket; and the opening of the crumpled-up cigarette package.

### A

No question is raised here concerning the lawfulness of the patdown of respondent's coat pocket. The Court of Appeals unanimously affirmed the right of a police officer to conduct a limited frisk for weapons when making an in-custody arrest, regardless of the nature of the crime for which the arrest was made. As it said:

> "[I]t would seem clearly unreasonable to expect a police officer to place a suspect in his squad car for transportation to the stationhouse without first taking reasonable measures to insure that the suspect is unarmed. We therefore conclude that whenever a police officer, acting within the bounds of his authority, makes an in-custody arrest, he may also conduct a limited *frisk* of the suspect's outer clothing in order to remove any weapons the suspect may have in his possession." 153 U. S. App. D. C. 114, 130, 471 F. 2d 1082, 1098 (1972) (footnote omitted; emphasis in original).

### B

With respect to the removal of the unknown object from the coat pocket, the first issue presented is whether that aspect of the search can be sustained as part of the limited frisk for weapons. The weapons search approved by the Court of Appeals was modeled upon the narrowly drawn protective search for weapons authorized in *Terry,* which consists "of a limited patting of the outer clothing of the suspect for concealed objects which might be used as instruments of assault." See *Sibron* v. *New York,* 392 U. S., at 65. See also *Terry, supra,* at 30.

It appears to have been conceded by the Government below that the removal of the object from respondent's coat pocket exceeded the scope of a *Terry* frisk for

weapons, since, under *Terry,* an officer may not remove an object from the suspect's pockets unless he has reason to believe it to be a dangerous weapon. 153 U. S. App. D. C., at 121 and n. 9, 471 F. 2d, at 1089 and n. 9, citing ALI Model Code of Pre-Arraignment Procedure § 110.2 (4) (Proposed Official Draft No. 1, 1972). Cf. *Sibron* v. *New York, supra,* at 65.[4]

In the present case, however, Officer Jenks had no reason to believe and did not in fact believe that the object in respondent's coat pocket was a weapon. He admitted later that the object did not feel like a gun. See n. 1, *supra.* In fact, he did not really have any thoughts one way or another about what was in the pocket. As Jenks himself testified, "I just searched him. I didn't think about what I was looking for. I just searched him." Since the removal of the object from the pocket cannot be justified as part of a limited *Terry* weapons frisk, the question arises whether it is reasonable for a police officer, when effecting an in-custody arrest of a traffic offender, to make a fuller search of the person than is permitted pursuant to *Terry.*

The underlying rationale of a search incident to arrest of a traffic offender initially suggests as reasonable a search whose scope is similar to the protective weapons frisk permitted in *Terry.* A search incident to arrest, as the majority indicates, has two basic functions: the removal of weapons the arrestee might use to resist arrest or effect an escape, and the seizure of evidence or fruits of the crime for which the arrest is made, so as to prevent their concealment or destruction. See *ante,* at 234; *Chimel* v. *California,* 395 U. S., at 763.

---

[4] This was also the position of the Police Department itself. Sergeant Donaldson, a Police Department Training Division instructor, testified: "If [the officer] could determine in his pat-down or frisk by squeezing that it was not, in fact, a weapon that could be used against him, then we don't instruct him to go further."

The Government does not now contend that the search of respondent's pocket can be justified by any need to find and seize evidence in order to prevent its concealment or destruction, for, as the Court of Appeals found, there is no evidence or fruits of the offense with which respondent was charged. The only rationale for a search in this case, then, is the removal of weapons which the arrestee might use to harm the officer and attempt an escape. This rationale, of course, is identical to the rationale of the search permitted in *Terry*. As we said there, "The sole justification of the search in the present situation is the protection of the police officer and others nearby, and it must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." *Terry* v. *Ohio, supra,* at 29. Since the underlying rationale of a *Terry* search and the search of a traffic violator are identical, the Court of Appeals held that the scope of the searches must be the same. And in view of its conclusion that the removal of the object from respondent's coat pocket exceeded the scope of a lawful *Terry* frisk, a conclusion not disputed by the Government or challenged by the majority here, the plurality of the Court of Appeals held that the removal of the package exceeded the scope of a lawful search incident to arrest of a traffic violator.

The problem with this approach, however, is that it ignores several significant differences between the context in which a search incident to arrest for a traffic violation is made, and the situation presented in *Terry*. Some of these differences would appear to suggest permitting a more thorough search in this case than was permitted in *Terry;* other differences suggest a narrower, more limited right to search than was there recognized.

The most obvious difference between the two contexts relates to whether the officer has cause to believe that

the individual he is dealing with possesses weapons which might be used against him. *Terry* did not permit an officer to conduct a weapons frisk of anyone he lawfully stopped on the street, but rather, only where "he has reason to believe that he is dealing with an armed and dangerous individual . . . ." 392 U. S., at 27. While the policeman who arrests a suspected rapist or robber may well have reason to believe he is dealing with an armed and dangerous person, certainly this does not hold true with equal force with respect to a person arrested for a motor vehicle violation of the sort involved in this case.

Nor was there any particular reason in this case to believe that respondent was dangerous. He had not attempted to evade arrest, but had quickly complied with the police both in bringing his car to a stop after being signaled to do so and in producing the documents Officer Jenks requested. In fact, Jenks admitted that he searched respondent face to face rather than in spread-eagle fashion because he had no reason to believe respondent would be violent.

While this difference between the situation presented in *Terry* and the context presented in this case would tend to suggest a lesser authority to search here than was permitted in *Terry,* other distinctions between the two cases suggest just the opposite. As the Court of Appeals noted, a crucial feature distinguishing the in-custody arrest from the *Terry* context " 'is not the greater likelihood that a person taken into custody is armed, but rather the increased likelihood of danger to the officer *if* in fact the person is armed.' " 153 U. S. App. D. C., at 130, 471 F. 2d, at 1098, quoting *People* v. *Superior Court of Los Angeles County,* 7 Cal. 3d, at 214, 496 P. 2d, at 1225 (Wright, C. J., concurring) (emphasis in original). A *Terry* stop involves a momentary encounter between officer and suspect, while an in-custody arrest places the two in close proximity

for a much longer period of time. If the individual happens to have a weapon on his person, he will certainly have much more opportunity to use it against the officer in the in-custody situation. The prolonged proximity also makes it more likely that the individual will be able to extricate any small hidden weapon which might go undetected in a weapons frisk, such as a safety pin or razor blade. In addition, a suspect taken into custody may feel more threatened by the serious restraint on his liberty than a person who is simply stopped by an officer for questioning, and may therefore be more likely to resort to force.

Thus, in some senses there is less need for a weapons search in the in-custody traffic arrest situation than in a *Terry* context; while in other ways, there is a greater need. Balancing these competing considerations in order to determine what is a reasonable warrantless search in the traffic arrest context is a difficult process, one for which there may be no easy analytical guideposts. We are dealing with factors not easily quantified and, therefore, not easily weighed one against the other. And the competing interests we are protecting—the individual's interest in remaining free from unnecessarily intrusive invasions of privacy and society's interest that police officers not take unnecessary risks in the performance of their duties—are each deserving of our most serious attention and do not themselves tip the balance in any particular direction.

As will be explained more fully below, I do not think it necessary to solve this balancing equation in this particular case. It is important to note, however, in view of the reasoning adopted by the majority, that available empirical evidence supports the result reached by the plurality of the Court of Appeals, rather than the result reached by the Court today.

The majority relies on statistics indicating that a significant percentage of murders of police officers occurs when the officers are making traffic stops. But these statistics only confirm what we recognized in *Terry*—that "American criminals have a long tradition of armed violence, and every year in this country many law enforcement officers are killed in the line of duty, and thousands more are wounded." *Terry* v. *Ohio, supra,* at 23. As the very next sentence in *Terry* recognized, however, "[v]irtually all of these deaths and a substantial portion of the injuries are inflicted with guns and knives." *Id.,* at 24. The statistics relied on by the Government in this case support this observation. Virtually all of the killings are caused by guns and knives, the very type of weapons which will not go undetected in a properly conducted weapons frisk.[5] It requires more than citation to these statistics, then, to support the proposition that it is reasonable for police officers to conduct more than a *Terry*-type frisk for weapons when seeking to disarm a traffic offender who is taken into custody.

## C

The majority opinion fails to recognize that the search conducted by Officer Jenks did not merely involve a search of respondent's person. It also included a separate search of effects found on his person. And even were we to assume, *arguendo,* that it was reasonable for Jenks to remove the object he felt in respondent's pocket, clearly there was no justification consistent with

---

[5] The Uniform Crime Reports prepared by the Federal Bureau of Investigation which are relied on by the majority, see *ante,* at 234 n. 5, indicate that 112 police officers were killed nationwide in 1972. Of these, 108 were killed by firearms. Two of the remaining four were killed with knives, and the last two cases involved a bomb and an automobile.

the Fourth Amendment which would authorize his opening the package and looking inside.

To begin with, after Jenks had the cigarette package in his hands, there is no indication that he had reason to believe or did in fact believe that the package contained a weapon. More importantly, even if the crumpled-up cigarette package had in fact contained some sort of small weapon, it would have been impossible for respondent to have used it once the package was in the officer's hands. Opening the package, therefore, did not further the protective purpose of the search. Even the dissenting opinion in the Court of Appeals conceded that "since the package was now in the officer's possession, any risk of the prisoner's use of a weapon in this package had been eliminated." [6] 153 U. S. App. D. C., at 150, 471 F. 2d, at 1118 (Wilkey, J., dissenting).

It is suggested, however, that since the custodial arrest itself represents a significant intrusion into the privacy of the person, any additional intrusion by way of opening or examining effects found on the person is not worthy of constitutional protection. But such an approach was expressly rejected by the Court in *Chimel*. There it

---

[6] The dissent argued, however, that "further inspection of the package was still justifiable as a protective measure. If the package *had* contained a razor blade, or live bullets, the officer would have been alerted to search Robinson much more thoroughly since the possibility of there being other weapons concealed on his person would increase." 153 U. S. App. D. C., at 150, 471 F. 2d, at 1118 (emphasis in original). But as Chief Judge Bazelon indicated in his opinion below, this kind of reasoning would render meaningless scope limitations on searches. Were one to accept this logic, for example, it would have been reasonable for the police to search the entire house in *Chimel* v. *California*, 395 U. S. 752 (1969), for if a weapon had been found somewhere in the house, the arresting officer would have been alerted to search Chimel himself more thoroughly, as the possibility of there being other weapons concealed on his person would arguably have increased.

was suggested that since the police had lawfully entered petitioner's house to effect an arrest, the additional invasion of privacy stemming from an accompanying search of the entire house was inconsequential. The Court answered: "[W]e can see no reason why, simply because some interference with an individual's privacy and freedom of movement has lawfully taken place, further intrusions should automatically be allowed despite the absence of a warrant that the Fourth Amendment would otherwise require." 395 U. S., at 766–767, n. 12.

The Fourth Amendment preserves the right of "the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." *Chimel* established the principle that the lawful right of the police to interfere with the security of the person did not, standing alone, automatically confer the right to interfere with the security and privacy of his house. Hence, the mere fact of an arrest should be no justification, in and of itself, for invading the privacy of the individual's personal effects.

The Government argues that it is difficult to see what constitutionally protected "expectation of privacy" a prisoner has in the interior of a cigarette pack. One wonders if the result in this case would have been the same were respondent a businessman who was lawfully taken into custody for driving without a license and whose wallet was taken from him by the police. Would it be reasonable for the police officer, because of the possibility that a razor blade was hidden somewhere in the wallet, to open it, remove all the contents, and examine each item carefully? Or suppose a lawyer lawfully arrested for a traffic offense is found to have a sealed envelope on his person. Would it be permissible for the arresting officer to tear open the envelope in order to make sure that it did not contain a clandestine weapon— perhaps a pin or a razor blade? Cf. *Harris* v. *United*

*States,* 331 U. S. 145 (1947); *Chimel* v. *California, supra,* at 758. Would it not be more consonant with the purpose of the Fourth Amendment and the legitimate needs of the police to require the officer, if he has any question whatsoever about what the wallet or letter contains, to hold on to it until the arrestee is brought to the precinct station? [7]

---

[7] Nor would it necessarily have been reasonable for the police to have opened the cigarette package at the police station. The Government argued below, as an alternative theory to justify the search in this case, that when a suspect is booked and is about to be placed in station house detention, it is reasonable to search his person to prevent the introduction of weapons or contraband into the jail facility and to inventory the personal effects found on the suspect. Since respondent's cigarette package would have been removed and opened at the station house anyway, the argument goes, the search might just as well take place in the field at the time of the arrest. This argument fails for two reasons. First, as the Court of Appeals had indicated in its opinion in *United States* v. *Mills,* 153 U. S. App. D. C. 156, 472 F. 2d 1231 (1972) (en banc), the justification for station-house searches is not the booking process itself, but rather the fact that the suspect will be placed in jail. In the District of Columbia, petty offenses of the sort involved in the present case are bailable, and, as the Government stipulated in *Mills,* the normal procedure is for offenders to be advised of the opportunity to post collateral at the station house and to avoid an inventory search unless they are unable or refuse to do so. *Id.,* at 160–161, 472 F. 2d, at 1235–1236. One cannot justify a full search in the field on a subsequent event that quite possibly may never take place.

Second, even had it become necessary to place respondent in confinement, it is still doubtful whether one could justify opening up the cigarette package and examining its contents. The purposes of preventing the introduction of weapons or contraband into the jail facility are fully served simply by removing the package from the prisoner. It is argued that the police must inventory effects found on the prisoner in order to avoid a later claim by the prisoner that jail personnel stole his property. But as the Court of Appeals noted in *Mills,* the police can protect themselves against such claims by means involving a less extreme intrusion on privacy than would be entailed in opening up and examining the

I, for one, cannot characterize any of these intrusions into the privacy of an individual's papers and effects as being negligible incidents to the more serious intrusion into the individual's privacy stemming from the arrest itself. Nor can any principled distinction be drawn between the hypothetical searches I have posed and the search of the cigarette package in this case. The only reasoned distinction is between warrantless searches which serve legitimate protective and evidentiary functions and those that do not. See *Chimel, supra,* at 766.

The search conducted by Officer Jenks in this case went far beyond what was reasonably necessary to protect him from harm or to ensure that respondent would not effect an escape from custody. In my view, it therefore fell outside the scope of a properly drawn "search incident to arrest" exception to the Fourth Amendment's warrant requirement. I would affirm the judgment of the Court of Appeals holding that the fruits of the search should have been suppressed at respondent's trial.

contents of all effects found on the person. As an example, the Court of Appeals suggested that the prisoner be given "an opportunity, like that accorded someone given a bathhouse locker for temporary use, to 'check' his belongings in a sealed envelope, perhaps upon executing a waiver releasing the officer of any responsibility." *Id.,* at 164 n. 11, 472 F. 2d, at 1239 n. 11.

The Government also suggested in oral argument before this Court that it would be administratively inconvenient to require a police officer, after removing an object from an arrestee, to hold on to the object rather than to look inside and determine what it contained. Mere administrative inconvenience, however, cannot justify invasion of Fourth Amendment rights. See *Chimel* v. *California, supra,* at 768. One can no doubt imagine cases where the inconvenience might be so substantial as to interfere with the task of transporting the suspect into custody. While these situations might necessitate a different rule, certainly in this case there would have been no inconvenience whatsoever. Officer Jenks could easily have placed the cigarette package in his own pocket or handed it to his partner to hold onto until they reached the precinct station.