STATE OF WEST VIRGINIA

*v.*

TELETHA DOROTHY WOODS

(No. 13423)

Decided July 9, 1974.

*Morton & Garrett, William C. Garrett, Albert L. Sommerville, Jr.,* for plaintiff in error.

*Chauncey H. Browning, Jr.,* Attorney General, *Richard E. Hardison,* Deputy Attorney General, *David P. Cleek,* Assistant Attorney General for defendant in error.

SPROUSE, JUSTICE:

This is a writ of error and supersedeas to the judgment of the Circuit Court of Webster County prosecuted by the defendant, Telethea Dorothy Woods, who was tried by a jury and found guilty of forgery and uttering a forged instrument with intent to defraud. After the defendant's conviction, an information was filed against her, charging her with the commission of a previous felony. She pleaded guilty to the information and was sentenced to the West Virginia State Prison for Women for a term of not less than one nor more than fifteen years.

The several errors assigned in the petition were consolidated by the defendant on appeal. The three principal contentions advanced by the defendant are that the

circuit court erred: (1) In permitting the State to introduce in evidence certain checks (Exhibits 2, 3, and 3A) on October 14, 1972, obtained as the result of an unconstitutional search and seizure; (2) in admitting into evidence the defendant's extrajudicial statement in violation of her constitutional rights; and (3) in granting State's Instruction No. 9 concerning the evidentiary weight to be given the defendant's possession of the forged check.

The defendant was indicted for forging and uttering a check made payable to the order of Dorothy Woods and drawn by E. V. White upon the Webster Springs National Bank. The evidence disclosed that the defendant cashed the check at a small store, owned and operated by Lille Adkins, in Webster Springs. According to Mrs. Adkins' testimony, the defendant "guaranteed it to be good" because she got one every month. Written on the check was the language "For Rent on House". The check was subsequently returned to Mrs. Adkins by the bank, there being no such account. Mrs. Adkins, thereafter, procured a warrant for the arrest of the defendant.

The defendant had been previously arrested on another similar charge on October 14, 1972, in Nicholas County, West Virginia, by a state police officer investigating complaints of other allegedly forged and uttered checks. At the time of this arrest, she was transported to Webster County and incarcerated. Two days later, on October 16, 1972, the Lille Adkins' warrant was served on the defendant during her incarceration in the Webster County Jail. On the charge contained in that warrant, she was indicted.

Practically all of the evidence presented at the trial related to seven checks introduced at the trial by the State as State's Exhibits 1, 2, 3, 3A, 4, 5 and 6. The E. V. White check, cashed by Mrs. Adkins, was introduced as State's Exhibit 1. There is, of course, no question of its admissibility in evidence.

An employee of the bank testified that the records of the Webster County National Bank reflected no account

in the name of E. V. White. A deputy sheriff of Webster County testified that he attempted to serve a subpoena for E. V. White but could find no such person. The defendant's mother and father testified that they were not aware that the defendant owned or rented any property and did not know of an E. V. White.

Evidence was also presented that the defendant cashed three other checks, State's Exhibits 4, 5 and 6, at various places. These checks were obtained by the state police investigating officer from a justice of the peace and the Circuit Clerk of Webster County, who had obtained them from complaining merchants. Two of the checks were drawn in the name of A. W. Skidmore and the other in the name of David Miller. Skidmore and Miller testified that they had neither made nor signed the checks. The various persons cashing the checks testified that they had been presented to them by the defendant for payment. Each was endorsed with the name of Dorothy Woods. Only one of these witnesses testified that she had seen the defendant endorse the check.

State's Exhibits 2, 3 and 3A were taken from the de-defendant's handbag pursuant to a search of the bag conducted by the state police officer at the time of her incarceration. The investigating officer testified that he arrested her, took her bag into his custody and cursorily looked at its contents. He then placed her in his police cruiser and transported her to Webster County. The officer and the defendant arrived at the state police office in Webster Springs two hours later. There is no explanation in the record of what ensued during that two hour period of time. Upon thier arrival at the state police office, the investigating officer dumped the contents of the handbag upon the "counter" and searched the contents in detail. The defendant cooperated, handing the three checks to the officer.

These checks were purportedly drawn by Roy Woods, A. V. Skidmore and Clyde Leslie. Each was payable to Dorothy Woods. The purported drawers testified that they

did not make the checks and that the signatures were not theirs.

The first question for decision involves the constitutionality of the search of the defendant's handbag. Any evidence uncovered as a result of a warrantless search in connection with an unlawful arrest, of course, is illegal and violative of the Fourth Amendment of the United States as well as Article III, Section 6 of the Constitution of West Virginia. *State v. Thomas,* 157 W.Va. 640, 203 S.E. 2d 445; *State v. Duvernoy,* 156 W.Va. 578, 195 S.E.2d 631. There is some confusion in the testimony on whether the initial arrest on October 14, 1972, was accomplished with a warrant, but there is no doubt that the arrest was a lawful arrest. This case, then, is obviously distinguishable from *Duvernoy* and *Thomas* and related cases involving unlawful arrests.

In testing the constitutionality of the officer's search in the instant case, we are not guided by the frequently cited rule of *Terry v. Ohio,* 392 U.S. 1, which dealt not with a warrantless search incidental to an arrest, but with a "protective frisk" for weapons incidental to an investigative stop by a police officer based on less than probable cause to arrest; nor do we have present the problem in the landmark case of *Chimel v. California,* 395 U.S. 752. The primary problem in *Chimel* involved the permissible area or scope of the search. The rule, as announced in *Chimel,* is:

"* * * When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction." *Chimel v. California, supra* at 762-763.

Two recent United States Supreme Court cases extended the scope of *Chimel* and removed any doubt as to

the type of evidence which is subject to confiscation in a search conducted incident to a legal arrest. In *United States v. Robinson,* 414 U.S. 218, 38 L. Ed. 2d 427, and *Gustafson v. Florida,* 414 U.S. 260, 38 L. Ed. 2d 456, the Court considered the admissibility in evidence of narcotics confiscated by a search incident to an arrest for a traffic violation. In the *Robinson* case, the arrest was made because the police officer, having previously checked the defendant's operator's permit, had probable cause to suspect that he was driving while his driver's license had been revoked. Upon arrest he conducted a full body search of the defendant and discovered a cigarette package containing heroin. In the *Gustafson* trial, the defendant had been arrested for driving an automobile without an operator's license. In both *Robinson* and *Gustafson* there was no doubt but that the searches were conducted in connection with and incident to a legal arrest. The Supreme Court held, in unequivocal language, that the limitations of *Terry v. Ohio* did not apply to a search incident to a lawful arrest, and evidence of other unrelated crimes discovered and confiscated during such search may be used in connection with the trial of such crimes.

There can be no doubt that the officer arresting Mrs. Woods was within the permissible scope of search. The handbag or purse was in her possession. The only question presented is whether the complete and detailed warrantless search was "incident" to the arrest which occurred two hours previous to the search.

The United States Supreme Court recently reviewed the rules relating to the permissible lapse of time between a lawful, custodial arrest and a subsequent warrantless search. In *United States v. Edwards,* 415 U.S. 800, 39 L. Ed. 2d 771, the defendant was arrested shortly after 11:00 p.m. and taken to jail. The next morning, some ten hours later, trousers and a T-shirt were purchased for the defendant to substitute for the clothing which he had been wearing at the time of his arrest. His clothing was taken from him, and evidence removed from the clothing was

introduced at the trial over his objection. The Court of Appeals reversed the conviction on the ground that the warrantless search of the clothing had been carried out "after the administrative process and mechanics of arrest had come to a halt."

The Supreme Court reviewed the rule covering custodial search, stressing the historical propriety of searching a person incident to incarceration and stated: "With or without probable cause, the authorities were entitled at that point [the time of incarceration] not only to search Edwards' clothing but also to take it from him and keep it in official custody. * * *" *United States v. Edwards, supra,* 39 L. Ed. 2d at 776.

The Court cited *United States v. Caruso,* 358 F.2d 184 (2d Cir.), *cert. denied,* 385 U.S. 862, where the defendant's clothes were not taken until six hours after his arrival at the place of detention, saying:

> "Caruso is typical of most cases in the courts of appeals that have long since concluded that once the accused is lawfully arrested and is in custody, the effects in his possession at the place of detention that were subject to search at the time and place of his arrest may lawfully be searched and seized without a warrant even though a substantial period of time has elapsed between the arrest and subsequent administrative processing, on the one hand, and the taking of the property for use as evidence, on the other. This is true where the clothing or effects are immediately seized upon arrival at the jail, held under the defendant's name in the 'property room' of the jail, and at a later time searched and taken for use at the subsequent criminal trial. The result is the same where the property is not physically taken from the defendant until sometime after his incarceration." *United States v. Edwards, supra,* 39 L. Ed. 2d at 778.

Concerning the defendant Edwards, the Court said:

> "* * * But it was late at night; no substitute clothing was then available for Edwards to wear, and it would certainly have been unreasonable for the

> police to have stripped respondent of his clothing and left him exposed in his cell throughout the night. * * * This was no more than taking from respondent the effects in his immediate possession that constituted evidence of crime. This was and is a normal incident of a custodial arrest, and reasonable delay in effectuating it does not change the fact that Edwards was no more imposed upon than he could have been at the time and place of the arrest or immediately upon arrival at the place of detention. The police did no more on June 1 than they were entitled to do incident to the usual custodial arrest and incarceration." *United States v. Edwards, supra,* 39 L. Ed. 2d at 776-77.

The Court indicated that even if a warrant were required after the "administrative mechanics of arrest have been completed and the prisoner is incarcerated", the normal processes incident to arrest and custody were not completed when Edwards was placed in a cell.

Limited to the facts in this case, we feel there can be no question but that the search by the police officer conducted in the state police office two hours after the initial arrest was incident to the arrest and not violative of the defendant's constitutional rights either under the Constitution of the United States or the Constitution of West Virginia.

The trooper placed the defendant in his automobile immediately upon arrest and took her handbag into his possession. This is not only customary police procedure, but is certainly in keeping with efficient protective practice. The record does not disclose what transpired during the two hours from the initial arrest until arrival at the state police office, but there is nothing to indicate the occurrence of anything other than normal police procedures. The officer testified it would have been cumbersome and impracticable to search the purse in the car. The purse contained a large amount of material, and it would have been impractical to empty the material on the seat of the automobile. There is no evidence of any improper

motive on the part of the police officer in delaying the search. He did not try to deceive the defendant for the purpose of delay and he had the handbag in his custody during the entire two hour period.

A search of a handbag or clothing of a defendant in connection with a custodial arrest is traditional, not only for the purposes expressed in *Chimel,* but for the purposes of determining what a prisoner may keep on his person and what must be maintained in custody for him. *United States v. Edwards, supra.* This is particularly pertinent in this case, inasmuch as the defendant's purse was searched in this careful manner as soon as she arrived at the first custodial establishment. The arrest was lawful, the search was lawful, and the trial court committed no error by receiving the fruits of the search into evidence.

The defendant's second principal ground of error relates to the action of the trial court in admitting in evidence a statement made by the defendant to the investigating officer on December 1, 1972, some six weeks after her arrest. The statement was taken in writing by the trooper and later typed and signed by the defendant. Prior to taking the statement, the trooper handed her a typed information sheet advising her of her right: To remain silent; to have her counsel present at her questioning; to have counsel appointed for her if she could not afford one; to stop answering questions at any time she wished; and, advising her that the statement could be used against her in court. He did not read the statement to her, but gave it to her to read. She then told the trooper she understood the statements and her rights and would give him a statement. He also testified that no threats or promises were made to her. In *Miranda v. Arizona,* 384 U.S. 436, the Supreme Court set out the defendant's rights under these circumstances now familiar to every police officer:

> "* * * Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as

> evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him." *Miranda v. Arizona, supra* at 444-45.

It is clear that the investigating officer complied with the *Miranda* requirements. In the absence of unusual circumstances, we cannot say that greater care or circumspection on the part of the investigating officer should be required. The defendant's contention is, therefore, without merit.

The defendant also contends that the court committed error in giving State's Instruction No. 9, which is as follows:

> "The Court instructs the jury that the unexplained possession of a forged instrument by one who endeavors to obtain money thereon is prima facie evidence that such person forged the instrument, but such prima facie evidence may be rebutted by an explanation satisfactory to the jury as to how she came into the possession of the instrument."

There is some confusion in West Virginia concerning the weight to be given the possession of a forged instrument. The State contends it is prima facie evidence of forgery. The defendant asserts it is only a circumstance that may be considered by the jury. In *State v. Austin,* 93 W.Va. 704, 117 S.E. 607, the court approved an instruction indicating that the uttering or passing of a forged check is indicative of the defendant's guilt and should be considered by the jury. This Court said: "It need scarcely be stated that the passing or uttering of the check alleged to be forged is a strong circumstance to be considered as tending to show intention to defraud, and evidence thereof is

clearly admissible * * *." *State v. Austin, supra* at 715, 117 S.E.2d at 611.

On the other hand, in *State v. Runnion,* 122 W.Va. 134, 7 S.E.2d 648, this Court criticized an instruction which told the jury that the mere uttering of a forged instrument by an individual may be considered as a circumstance " 'tending to show' that he had knowledge of its falsity." The Court said the effect of the instruction was to tell the jury that an individual, however innocent he may be as to any knowledge of the falsity, may be convicted, if he utters the same, on the mere ground of possession of the check and uttering it. The Court held that the language "tending to show knowledge of its falsity" should have been omitted from the instruction.

The courts in practically all jurisdictions have held that a person's possession and uttering of a forged instrument, or an attempt to utter it, are matters relevant to and admissible upon the issue of his participation in its forgery. WHARTON CRIMINAL EVIDENCE, Section 141, pages 241-242. The courts throughout the country, however, are not unanimous in declaring the exact probative value to be placed on such evidence by the jury. The better reasoned rule seems to be as stated in *Bullock v. Commonwealth,* 205 Va. 558, 138 S.E.2d 261, where the court said:

"* * * Aside from the improper direction that the 'presumption becomes conclusive,' the instruction placed upon the defendant the burden of explaining the 'possession or forgery' of the instrument. While the defendant, if innocent, might have satisfactorily explained his *possession* of the instrument, it is difficult to see how he could have explained the *forgery.*

"The instruction should have told the jury that the unexplained possession of a forged instrument by one who endeavors to obtain money thereon is prima facie evidence that such person forged the instrument, but that such prima facie evidence may be rebutted by an explanation satisfactory to the jury as to how he came into possession of the instrument." *Bullock v. Commonwealth, supra* at 563, 138 S.E.2d at 265.

958

See also *Bateman v. Commonwealth,* 205 Va. 595, 139 S.E.2d 102; 37 C.J.S., *Forgery,* Section 80 (b), page 91; 36 AM. JUR. 2d, *Forgery,* Section 44, page 706.

Although there may have been some confusion to the exact rule in West Virginia because of seemingly contradictory treatments in *Runnion* and *Austin,* the rule as expressed by the Virginia court in *Bullock* seems to be the better one. We hold, therefore, that State's Instruction No. 9 correctly stated the law as it relates to the unexplained possession of a forged instrument by one who endeavors to obtain money on the forged instrument.

For reasons stated in this opinion, the judgment of the Circuit Court of Webster County is affirmed.

*Affirmed.*