

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 77162-1-I |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| ABRAHAM CASTORENA GONZALEZ, | ) | UNPUBLISHED OPINION |
| Appellant. | ) | FILED: January 7, 2019 |

SMITH, J. — Abraham Castorena Gonzalez (Castorena)[1] appeals his conviction for possession of heroin with intent to deliver. He also appeals the trial court's assessment of $1,962 in nonmandatory legal financial obligations (LFOs). Castorena argues that the trial court erred by not suppressing evidence seized from the backpack found during a search incident to his arrest, and that the trial court did not conduct a proper inquiry before ordering him to pay nonmandatory LFOs.

The evidence seized from the backpack was found during a valid search of Castorena's person incident to arrest under article I, section 7 of the Washington State Constitution. But we agree that the trial court's inquiry into Castorena's ability to pay LFOs was insufficient. Because the State conceded as much at oral argument and requested that the disputed LFOs be stricken in lieu

---

[1] We refer to the appellant as "Castorena" for consistency with his opening and reply briefs.

of a remand hearing, we affirm and remand to the trial court to enter a revised judgment and sentence that strikes the $1,000 VUCSA (violation of the Uniform Controlled Substances Act) fine and the $962 in court-appointed attorney fees originally assessed.

## FACTS

On March 30, 2017, at about 12:30 a.m., Sergeant Tim McAllister of the Everett Police Department responded to a 911 call from the clerk of an Arco AM/PM station on Evergreen Way. The AM/PM clerk reported that a man, later identified as Abraham Castorena Gonzalez, entered the AM/PM store with a backpack. Castorena went into the store bathroom, locked himself inside, and remained there for 30 to 45 minutes, causing a disturbance. On arrival, Sergeant McAllister waited for two other officers to arrive before the officers tried to get Castorena to open the bathroom door.

Castorena eventually opened the door to the bathroom, which was an approximately 10 feet by 10 feet single-occupancy bathroom with a toilet, urinal, and sink. Sergeant McAllister described the bathroom as messy, with toilet paper strewn all over the floor. He saw a backpack and a couple of jackets in the bathroom. Castorena was alone in the bathroom.

After Castorena stepped outside of the bathroom and while the other officers were in the process of identifying Castorena and giving him a formal trespass warning, Sergeant McAllister went into the bathroom to gather the backpack and jackets. Sergeant McAllister placed the backpack and jackets in a pile in "close proximity" to Castorena.

Once they identified Castorena, the officers formally trespassed him and told him that he was free to go. Castorena then approached the pile of items that Sergeant McAllister had placed outside the bathroom and picked up one of the jackets. As he did so, the officers heard the sound of something metal hitting the floor. Sergeant McAllister looked down and observed that a metal spoon with brown residue in it had fallen out of the jacket that Castorena still held in his hand. Sergeant McAllister recognized the spoon as a heroin "cooker." Sergeant McAllister then took the jacket from Castorena's hand and placed him under arrest.

The two other officers—Officers Adam Hoffenbacker and Alex Olson—handcuffed Castorena and placed him in the backseat of Officer Hoffenbacker's patrol car. Sergeant McAllister seized the jackets and backpack, followed the other officers and Castorena out to the patrol car, and placed the items on the hood of the car. During Sergeant McAllister's search of the jacket that the spoon had fallen out of, he found a large "baggie" with a brown granular substance in it. He also conducted a preliminary search of the backpack, finding an uncapped syringe with brown liquid in it. Officers Hoffenbacker and Olson later continued with a more extensive search of the backpack and found 13 individually wrapped pieces of suspected heroin and a scale.

The State charged Castorena with possession of a controlled substance with intent to manufacture or deliver. Before trial, Castorena moved to suppress the evidence found in the backpack, arguing that the warrantless search of the backpack was not a valid search incident to arrest. The court denied

3

Castorena's motion. A jury convicted Castorena for possession of heroin with intent to deliver. At sentencing, the court ordered Castorena to pay a $1,000 VUCSA fine and $962 in court-appointed attorney fees.

Castorena appeals.

## ANALYSIS

### *Warrantless Search of Backpack*

Castorena argues that the warrantless search of the backpack violated his rights under the state and federal constitutions because the search was not a valid search of his person incident to arrest. We disagree.

When reviewing the denial of a suppression motion, this court "determines whether substantial evidence supports the challenged findings of fact and whether the findings support the conclusions of law." State v. Garvin, 166 Wn.2d 242, 249, 207 P.3d 1266 (2009). "Evidence is substantial when it is enough 'to persuade a fair-minded person of the truth of the stated premise.'" Garvin, 166 Wn.2d at 249 (quoting State v. Reid, 98 Wn. App. 152, 156, 988 P.2d 1038 (1999)). We review de novo the trial court's conclusions of law regarding a motion to suppress. State v. VanNess, 186 Wn. App. 148, 154, 344 P.3d 713 (2015).

The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures. U.S. CONST. amend. IV. The Washington State Constitution further narrows the State's authority to search. VanNess, 186 Wn. App. at 155; State v. Valdez, 167 Wn.2d 761, 771-72, 224 P.3d 751 (2009). Where, as here, a party alleges violations of both the

federal and Washington State constitutions, "we analyze the Washington State Constitution first because it is more protective of individual privacy." State v. MacDicken, 179 Wn.2d 936, 940, 319 P.3d 31 (2014) (citing State v. Walker, 157 Wn.2d 307, 313, 138 P.3d 113 (2006)). Under the Washington State Constitution, "a warrantless search is per se unreasonable unless the State proves that one of the few 'carefully drawn and jealously guarded exceptions' applies." State v. Byrd, 178 Wn.2d 611, 616, 310 P.3d 793 (2013) (quoting State v. Bravo Ortega, 177 Wn.2d 116, 122, 297 P.3d 57 (2013)).

The exception at issue in this case is the exception for searches incident to arrest. There are two types of searches incident to arrest: "(1) a search of the arrestee's person (including those personal effects immediately associated with his or her person—such as purses, backpacks, or even luggage) and (2) a search of the area within the arrestee's immediate control." State v. Brock, 184 Wn.2d 148, 154, 355 P.3d 1118 (2015). "A valid search of the latter requires a justification grounded in either officer safety or evidence preservation—there must be some articulable concern that the arrestee can access the item in order to draw a weapon or destroy the evidence." Brock, 184 Wn.2d at 154 (citing Byrd, 178 Wn.2d at 617). By contrast, a search of the arrestee's *person* "presumes exigencies and is justified as part of the arrest." MacDicken, 179 Wn.2d at 941 (citing Byrd, 178 Wn.2d at 618). Accordingly, a search of the arrestee's person requires no additional justification beyond the validity of the arrest itself. Byrd, 178 Wn.2d at 617-18 (citing United States v. Robinson, 414 U.S. 218, 235, 94 S. Ct. 467, 38 L. Ed. 2d 427 (1973)).

Here, Castorena does not dispute the validity of his arrest. And the State does not argue that the search of the backpack should be validated as a search of the area within Castorena's immediate control. Accordingly, the only issue before us is whether the search of the backpack was a valid search of Castorena's *person* incident to arrest. For the reasons that follow, we conclude that it was.

Whether an item is part of the arrestee's person is determined by applying the time-of-arrest rule, which turns on whether the arrestee had "actual and exclusive possession at or immediately preceding the time of arrest.'" State v. Byrd, 178 Wn.2d at 620-23. Our Supreme Court recently analyzed the scope of the time-of-arrest rule in Brock. In Brock, an officer was patrolling Golden Gardens Park after hours when he noticed that the men's restroom door was open and the lights were on. 184 Wn.2d at 151. The officer could see a person's legs inside a bathroom stall. Brock, 184 Wn.2d at 151. The officer waited about 10 minutes before Antoine Brock emerged, carrying a backpack. Brock, 184 Wn.2d at 151. The officer identified himself, had Brock remove the backpack, and performed a Terry[2] stop and frisk. Brock, 184 Wn.2d at 151. For safety reasons, the officer carried Brock's backpack to his vehicle and placed it on the passenger seat. Brock, 184 Wn.2d at 152.

After the officer determined that Brock had falsely identified himself as "Dorien Halley," the officer arrested Brock for providing false information. Brock, 184 Wn.2d at 151-52. Because Brock had been cooperative, the officer did not

---

[2] Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

use handcuffs and instead instructed Brock to remain near the curb while the officer returned to his vehicle to search the backpack for identification. Brock, 184 Wn.2d at 152. In the backpack, the officer found a wallet containing what appeared to be marijuana and methamphetamine. Brock, 184 Wn.2d at 152. The officer also found a Department of Corrections inmate identification card with Brock's photograph and identifying him as Antoine L. Brock. Brock, 184 Wn.2d at 152. The officer then handcuffed Brock and put him in the back of his vehicle. Brock, 184 Wn.2d at 152.

The officer ran Brock's actual name through the state database and discovered that Brock had a felony arrest warrant. Brock, 184 Wn.2d at 152. After the Washington State Patrol confirmed the warrant, the officer "had no choice" but to take Brock to jail. Brock, 184 Wn.2d at 152. Before doing so, the officer emptied the contents of the backpack, discovering numerous checks, credit cards, mail, and more baggies of suspected narcotics. Brock, 184 Wn.2d at 153.

Brock moved to suppress the evidence discovered during the search of his backpack. Brock, 184 Wn.2d at 153. The trial court denied Brock's motion, concluding that the search was a valid search incident to arrest. Brock, 184 Wn.2d at 153. Brock appealed, and this court reversed, reasoning that Brock did not have actual, exclusive possession of the backpack immediately preceding the arrest. Brock, 184 Wn.2d at 153. The Washington Supreme Court reversed, explaining:

> Because the search incident to arrest rule recognizes the
> practicalities of an officer having to secure and transport personal

items as part of the arrestee's person, we draw the line of "immediately preceding" with that focus. *The proper inquiry is whether possession so immediately precedes arrest that the item is still functionally a part of the arrestee's person. Put simply, personal items that will go to jail with the arrestee are considered in the arrestee's "possession" and are within the scope of the officer's authority to search.*

Brock, 184 Wn.2d at 158 (emphasis added). The court concluded that the search of Brock's backpack was a valid search of his person, observing that there was no place to stow the backpack and that Brock would have to bring the backpack with him into custody. Brock, 184 Wn.2d at 159.

Brock controls here. The trial court correctly concluded that under Brock, the search of the backpack was a valid search of Castorena's person. Specifically, the trial court made an unchallenged finding that the officers who responded to the scene "perceived the . . . backpack to belong to the defendant and intended to book [it] into jail, or their own property room, incident to the defendant's booking at the jail, as opposed to leaving the items there at the scene." This unchallenged finding is a verity on appeal. State v. Acrey, 148 Wn.2d 738, 745, 64 P.3d 594 (2003). Accordingly, the backpack here, like the backpack in Brock, implicates the presumed exigencies underlying the time-of-arrest rule—namely, "safety concerns associated with the officer having to secure those articles of clothing, purses, backpacks, and even luggage, that will travel with the arrestee into custody." Brock, 184 Wn.2d at 156. The court did not err by denying Castorena's motion to suppress.

Castorena argues that although the backpack was potentially within his reach during his interaction with officers, he "was not in actual physical

possession of the backpack at the time of his initial seizure, such that the backpack was 'functionally a part of' his person." He relies on Byrd for the proposition that reaching distance proximity is not enough to justify the search of the backpack as a search of his person. Castorena's reliance on Byrd is misplaced. The court in Byrd did caution that the time-of-arrest rule is narrow and does not extend to articles "within the arrestee's reach but not actually in his possession." Byrd, 178 Wn.2d at 623. And in Byrd, the purse that officers searched had been sitting in the arrestee's lap at the time of her arrest. Byrd, 178 Wn.2d at 615. But nothing in Byrd suggests, as Castorena does, that physical contact is required for actual possession. Rather, under Brock, whether a personal item is part of the arrestee's person depends on whether that item is "immediately associated" with the arrestee such that it "will necessarily travel with the arrestee to jail." Brock, 184 Wn.2d at 155. Here, it is undisputed that Castorena carried the backpack with him into the small bathroom, locked himself in the bathroom, and remained alone with the backpack therein. Additionally, Sergeant McAllister testified that Castorena was "standing over" the backpack as he picked up the jacket with the heroin "cooker" just before the arrest. Sergeant McAllister also testified that Castorena never asked to leave the backpack at the scene and that there was no one else at the scene with whom Castorena could have left the backpack. In short, the backpack was immediately associated with Castorena, such that it would necessarily travel with him to jail, and Castorena's arguments otherwise are unpersuasive. For the same reasons, Castorena's attempt to distinguish Brock on the basis that Castorena was not carrying the

backpack at any time during his interaction with officers is also unpersuasive.[3]

Castorena next contends that validating the search in this case would result in an impermissible untethering of the time-of-arrest rule from evidence preservation and officer safety, the two rationales that the United States Supreme Court articulated in Chimel v. California, 395 U.S. 752, 89 S. Ct. 2034, 23 L. Ed. 2d 685 (1969), as justifying the search incident to arrest exception. See Chimel, 395 U.S. at 763. In other words, Castorena suggests that the search of his backpack is invalid under United States Supreme Court precedent.[4]

But contrary to Castorena's assertions, the time-of-arrest rule, as articulated by our Supreme Court in Brock, is indeed grounded in evidence

---

[3] At oral argument, Castorena attempted for the first time to distinguish Brock by arguing that Brock involved a Terry stop that ripened into an arrest, whereas here, there was no "unbroken chain" of events because Castorena became free to leave after his initial interaction with officers. But Brock is clear that the scope of the arrestee's person is determined through the lens of the underlying justification for the time-of-arrest rule, i.e., the recognition of "the practicalities of an officer having to secure and transport personal items as part of the arrestee's person." Brock, 194 Wn.2d at 158. Accordingly, the fact that Castorena was free to leave just before he approached the pile of his belongings does not negate the fact that the backpack was, as discussed above, immediately associated with Castorena, such that it would need to be transported with him to jail. Castorena's attempt to distinguish Brock on this basis is unpersuasive.

[4] At oral argument, Castorena relied for the first time on Riley v. California, ___ U.S. ___, 134 S. Ct. 2473, 189 L. Ed. 2d 430 (2014), to support this argument. In Riley, the United States Supreme Court declined to extend the arrestee's person as far as the data on the arrestee's cell phone. Riley, 134 S. Ct. at 2485. The Riley court did discuss the twin rationales of Chimel. See Riley, 134 S. Ct. at 2483. But the Court also distinguished between data and physical objects, observing that while the categorical rule authorizing searches of a person incident to arrest "strikes the appropriate balance in the context of physical objects, neither of its rationales has much force with respect to digital content on cell phones." Riley, 134 S. Ct. at 2484. Here, only physical objects are concerned, and therefore Riley does not control.

preservation and officer safety. Specifically, in Brock, the court observed that, "having no other place to safely stow [his backpack], Brock would have to bring the backpack along with him into custody." Brock, 184 Wn.2d at 159. The court stated that "there are presumptive safety and evidence preservation concerns associated with police taking custody of those personal items immediately associated with the arrestee." Brock, 184 Wn.2d at 155. We are cognizant that "we must draw . . . exceptions to the warrant requirement narrowly," and that the exceptions must not be expanded arbitrarily but must track their underlying justifications. Brock, 184 Wn.2d at 158. Indeed, this could well be a different case had there been someone on the scene ready to take possession of Castorena's backpack. But instead, as in Brock, Castorena had no other place to stow his backpack and would have had to bring it along with him into custody, thereby implicating the presumptive safety and evidence preservation concerns discussed in Brock. Brock controls.

As a final matter, Castorena assigns error to the trial court's failure to make a finding that the search of the backpack and the jacket occurred "at [a] great distance from the location of the seizure of the items and after [Castorena] was secured." We need not decide whether it was error to omit this finding because even if it were, the error was harmless. Under the time-of-arrest rule, what matters is the relationship between the arrestee and the item at and immediately preceding the time of arrest—not their relationship at the time of the search. See MacDicken, 179 Wn.2d at 941 (search of bags upheld as a valid search of arrestee's person even though search took place after arrestee was

secured and bags had been moved a car's length away).

*Assessment of Nonmandatory Legal Financial Obligations*

Castorena argues that the trial court erred by ordering him to pay a $1,000 VUCSA fine and $962 in court-appointed attorney fees without conducting an adequate inquiry into his ability to pay. We agree.

"[T]he question of whether the trial court adequately inquired into [a defendant's] ability to pay discretionary LFOs involves both a factual and a legal component." State v. Ramirez, ___ Wn.2d ___, 426 P.3d 714, 718 (2018). We review de novo whether the trial court conducted an adequate inquiry into the defendant's ability to pay. Ramirez, 426 P.3d at 719. We then review under an abuse-of-discretion standard whether the trial court properly "balance[d] the defendant's ability to pay against the burden of his obligation." Ramirez, 426 P.3d at 719. "[D]iscretion is necessarily abused when it is manifestly unreasonable or based on untenable grounds or reasons." Ramirez, 426 P.3d at 719.

At the time Castorena was sentenced, former RCW 10.01.160(3) (2015) provided:

> The court shall not order a defendant to pay costs unless the defendant is or will be able to pay them. In determining the amount and method of payment of costs, the court shall take account of the financial resources of the defendant and the nature of the burden that payment of costs will impose.

Additionally, RCW 69.50.430(1) states that the $1,000 VUCSA fine may be waived based on indigence.

In State v. Blazina, 182 Wn.2d 827, 344 P.3d 680 (2015), the Washington Supreme Court held that the trial court must "make an individualized inquiry into the defendant's current and future ability to pay before the court imposes LFOs." Blazina, 182 Wn.2d at 839. The court also instructed trial courts to look to GR 34 for guidance. Blazina, 182 Wn.2d at 838. Under GR 34, a person is considered indigent if, among other things, he or she receives certain types of need-based assistance or has income at or below 125 percent of the federal poverty guideline. GR 34. The court noted that "if someone does meet the GR 34 standard for indigency, courts should seriously question that person's ability to pay LFOs." Blazina, 182 Wn.2d at 839. Finally, the court in Blazina held that trial courts must also consider important factors "such as incarceration and a defendant's other debts, including restitution, when determining a defendant's ability to pay." Blazina, 182 Wn.2d at 838.

In 2018, after Castorena was sentenced, House Bill 1783 amended RCW 10.01.160(3) "to categorically prohibit the imposition of any discretionary costs on indigent defendants." Ramirez, 426 P.3d at 718 (citing LAWS OF 2018, ch. 269, § 6(3)).[5] Then, during the pendency of this appeal, our Supreme Court decided Ramirez, which held that the amendments to RCW 10.01.160(3) apply prospectively to cases pending on direct review. Ramirez, 426 P.3d at 722. The court also more fully described the nature of the inquiry required of a trial court

---

[5] House Bill 1783 also amended the criminal filing fee statute to prohibit courts from imposing the $200 filing fee on indigent defendants. However, Castorena does not challenge the trial court's imposition of the $200 filing fee, so we do not address that fee in this case.

13

under Blazina:

> Trial courts must meaningfully inquire into the mandatory factors established by Blazina, such as a defendant's incarceration and other debts, or whether a defendant meets the GR 34 standard for indigency. Trial courts must also consider other "important factors" relating to a defendant's financial circumstances, including employment history, income, assets and other financial resources, monthly living expenses, and other debts. Under this framework, trial courts must conduct an on-the-record inquiry into the mandatory Blazina factors and other "important factors" before imposing discretionary LFOs.

Ramirez, 426 P.3d at 723.

Here, the trial court made the following oral ruling in determining

Castorena's LFOs:

> [THE COURT:] . . . With regard to monetary assessments, I will assess the $500 victim penalty, $200 filing fee, the $100 DNA fee. Those are the fines and fees that I must impose, regardless of indigency.
>
> I have heard the question raised as to whether you were indigent, and I understand that you have no stable job, nor a place to stay, and I think it may well be, sir, that you have no legitimate, stable job. I don't really know what your job prospects are. I know that based on the evidence in this case, you had sufficient product on you to make a substantial amount of money. I also understand you successfully screened at the Office of Public Defense and were found to be indigent for those purposes, but of course that's all self-reported. They have nothing to go on, other than what is provided by you, sir, and now of course things are different because we had 12 citizens who feel that you were possessing those drugs with the intent to deliver, which is a lucrative business. There's no question about it.
>
> So I don't think I can find that you are indigent. In fact, I think it may well be that you have been earning and could earn considerable money, simply based on the verdict that the jury has entered. On the other hand, I don't have any credible evidence to the contrary.
>
> [DEFENSE COUNSEL]: May I respond to that, Your Honor?
>
> THE COURT: Respond to my decision?
>
> [DEFENSE COUNSEL]: To the evidence that came out, based on that.
>
> THE COURT: I will let you argue something in the midst of

14

my decision, yes. I don't usually do that, but I will let you.

[DEFENSE COUNSEL]: I apologize for interrupting. You know, it occurred to me that the one piece of testimony that came out during trial was that, you know, somebody may be a runner and that may be why they don't have cash on them and are taking an amount of drugs from one place to another, that I don't think would entail having access to the actual money that requires securing the amount of drugs that they were found with, and I believe that testimony was provided during the trial.

THE COURT: Indeed, it was.

[DEFENSE COUNSEL]: I guess I would just like the Court to consider that, in terms of Your Honor's indigency finding.

THE COURT: I do remember that testimony. I allow, as how that may well be the case. I really don't have any reason to think, and there wasn't any evidence bearing on the subject, that a person employed as a runner doesn't have any form of income. Perhaps it's not much, but on the other hand, perhaps it's a good deal.

Here, after all, we have a case of a person who apparently felt there was sufficient reason to dip into the product himself. I don't really know all the ins-and-outs of this. All I know is what the evidence, what evidence there was. I might speculate that he was a runner, but even then, I don't think I could speculate further, that he didn't make any money as a runner. I simply cannot find that he is indigent. I don't think that there is credible evidence that he is indigent, and I think that there is, on the contrary, credible evidence that he was in a position to be earning significant money tax-free. Most people have to pay taxes on their income, but people who make money illegally don't. At least I find it very difficult to imagine that anybody would report money earned as a runner for a drug dealer on their tax forms. So I don't find that he is indigent.

Now, where was I? I think I had already addressed the fines and fees that are mandatory, regardless of indigency. I have not found any evidence to support a conclusion that he was indigent. I have found evidence to support a conclusion that he is not indigent. And I think a reasonable inference might be that he is perhaps even less indigent than a lot of folks who pay their taxes, so I will impose the $1,000 VUCSA fine and the $962 for his court-appointed attorney which by the way is a deal. If you were going to purchase your attorney's services on the open market, $962 wouldn't begin to cover it. Also, I don't want you to think for an instant, sir, that the fact that you didn't win is a reflection on your attorney's performance. I saw her performance. I've seen her performance in other case, as well. You got a good deal, sir, $962 is a cheap price.

15

We conclude, and the State conceded at oral argument, that the trial court's inquiry was insufficient under Ramirez with respect to imposition of the VUCSA fine and the assessment of court-appointed attorney fees under RCW 10.01.160(3). The only inquiry that the trial court made was to ask how much cash was discovered on Castorena when he was arrested. The court did not inquire on the record about Castorena's other debts, the GR 34 standards for indigence, or Castorena's employment history, income, assets, financial resources, or living expenses. Instead, the court's decision to impose nonmandatory LFOs appears grounded primarily in (1) the trial court's speculation that as a convicted drug "runner," Castorena must have made a significant amount of money tax-free and (2) the trial court's opinion that $962 for attorney fees was "a good deal." But neither the trial court's unsupported speculation nor its perception of the value of services provided by Castorena's attorney are relevant considerations under Blazina and Ramirez, and the trial court's decision on this basis was manifestly unreasonable. Accordingly, the trial court abused its discretion by imposing nonmandatory LFOs without first conducting a proper inquiry into Castorena's indigence.

CONCLUSION

We affirm Castorena's conviction but hold that the trial court's inquiry into Castorena's ability to pay LFOs was deficient. At the State's request, we remand to the trial court with instructions to enter a revised judgment and sentence that

strikes the $1,000 VUCSA fine and the $962 in court-appointed attorney fees originally assessed.

WE CONCUR: