**IN THE COURT OF APPEALS OF THE STATE OF IDAHO**

**Docket No. 47751**

| | |
|---|---|
| STATE OF IDAHO, | ) |
| | ) **Filed: October 5, 2021** |
| Plaintiff-Respondent, | ) |
| | ) **Melanie Gagnepain, Clerk** |
| v. | ) |
| | ) **THIS IS AN UNPUBLISHED** |
| JUSTIN BRIAN PITTELKO, | ) **OPINION AND SHALL NOT** |
| | ) **BE CITED AS AUTHORITY** |
| Defendant-Appellant. | ) |
| | ) |

Appeal from the District Court of the First Judicial District, State of Idaho, Kootenai County. Hon. Scott Wayman, District Judge.

Judgment of conviction for possession of a controlled substance (methamphetamine), possession of a controlled substance (marijuana), possession of drug paraphernalia, and resisting, obstructing, or delaying an officer, <u>affirmed</u>.

Eric D. Fredericksen, State Appellate Public Defender; Andrea W. Reynolds, Deputy Appellate Public Defender, Boise, for appellant.

Hon. Lawrence G. Wasden, Attorney General; Mark W. Olson, Deputy Attorney General, Boise, for respondent.

---

HUSKEY, Chief Judge

Justin Brian Pittelko appeals from his judgment of conviction for possession of a controlled substance (methamphetamine); possession of a controlled substance (marijuana); possession of drug paraphernalia; and resisting, obstructing, or delaying an officer. Pittelko argues the district court erred in denying his motion to suppress because the search of his pocket constituted an unconstitutional, warrantless search. Because the search of his pocket was a lawful search incident to arrest, the district court did not err in denying Pittelko's motion, and the judgment of conviction is affirmed.

1

# I.

## FACTUAL AND PROCEDURAL BACKGROUND

Officer Pierson responded to an anonymous call regarding a verbal domestic disturbance, conveying that there was an unidentified male at the location yelling that he was going to slash an unidentified woman's tires. Officer Pierson learned that the parties involved were Pittelko and his wife. Officer Pierson testified that although she had never met Pittelko, she was familiar with his name because a probation officer advised her that Pittelko may be using and selling narcotics. A body camera video of the encounter shows that when Officer Pierson arrived at the scene, she informed another officer that Pittelko may be using and selling drugs. Officer Pierson testified that she informed the other officer of this due to the possible safety concerns surrounding individuals who use and sell narcotics; these individuals "typically have weapons on them, knives quite commonly."

It was dark at the scene, but Officer Pierson could hear people yelling and could make out a person standing behind a parked car. Officer Pierson called Pittelko's name, and the person standing behind the car responded. Trying to gain control over what the district court found to be "a very chaotic or unstable situation," Officer Pierson asked Pittelko to step out from behind the car so that she could see his hands, but Pittelko did not immediately respond to the command. Officer Pierson observed that Pittelko's clothing was bulky, including what she described as "super big and bulky pockets." Officer Pierson testified that the bulkiness of Pittelko's clothing was a result of him wearing multiple layers of clothing. Pittelko admitted that he had a knife on him, and Officer Pierson repeatedly ordered him not to reach for it. During this time, the district court found that background noise and concerns for officer safety were present, with Officer Pierson acting to protect other officers as they arrived at the scene.

Officer Pierson testified that she was concerned that the "big and bulky" pocket might contain a weapon so she approached and told Pittelko that she was going to pat him down for weapons. Officer Pierson placed Pittelko in handcuffs and told him that he was not in trouble and that he would not have been detained if he had followed directions and not reached for his knife. Officer Pierson discovered and removed a large knife in a sheath on Pittelko's hip. Body camera footage showed Pittelko state that he did not have any additional weapons on his person; Officer Pierson replied that because she did not know what the items were in the big and bulky pocket,

2

she was going to remove them. Ultimately, the district court found that Pittelko did not follow Officer Pierson's directions or cooperate fully with the search.

After completing the pat down, Officer Pierson told Pittelko that if he would have followed her commands he would not have been detained, explained that she had been called to investigate a verbal domestic disturbance, and asked questions about what occurred that night. Body camera footage showed Officer Pierson tell Pittelko, "I'm going to get your information and I'm going to be letting you go, depending on what [your wife] says."

Later Officer Pierson testified that during the pat down for weapons, she smelled marijuana "wafting" from Pittelko and that after she completed the pat down, she informed Pittelko of the smell and asked him where the marijuana was on his person. Body camera footage showed Pittelko reply that he had marijuana on his person, and Officer Pierson informed him that it was illegal to possess marijuana in Idaho so he could either give the drug to her or she could search him for it. Pittelko stated that he believed the marijuana was in his pocket, and Officer Pierson replied that "marijuana is not a big deal, if I even charge you with it, it is like a misdemeanor. Ok. That's if I decide to charge you with it."

Pittelko told Officer Pierson that the marijuana was in the larger front right pocket of his jeans. As Officer Pierson inserted her hand into the larger jean pocket, she testified that she felt what she believed was the stem and sharp edges of a glass pipe in the coin pocket.[1] Based on her training and experience, Officer Pierson testified that she believed the pipe was used to smoke methamphetamine or other illegal drugs. Before continuing to search for the bag of marijuana, Officer Pierson pulled the pipe out of Pittelko's coin pocket. Officer Pierson testified the pipe had a "cloudy, white substance in it" that was consistent with methamphetamine. Body camera footage showed Officer Pierson tell Pittelko "[w]e'll discuss this in a second, ok?" Because the pipe was broken, Officer Pierson asked Pittelko if there was anything else in his pocket that might cut her, and he told her the other pieces of the pipe were in the coin pocket. Officer Pierson testified that when she reached back into the coin pocket to pull out the remaining pieces of the pipe, she felt a container but could not remove it without turning the pocket "completely inside out." To facilitate this, Officer Pierson testified that she first removed the bag of marijuana from the larger pocket

---

[1] Officer Pierson testified that Pittelko's jeans had two pockets on the right side; a larger pocket and another smaller pocket which Officer Pierson referred to as a "coin pocket."

3

and then finished her search of the coin pocket, where she removed a container holding a brown substance.

The following descriptions of the ensuing events are taken from review of Officer Pierson's body camera footage. The district court relied on the body camera footage in its findings of fact and credibility determinations and the parties rely on many of the following exchanges shown in the camera footage to support their arguments on appeal.

Officer Pierson again asked Pittelko where the rest of the broken pipe was and expressed that if she cut herself on the remaining pieces, she was going to charge Pittelko accordingly. Officer Pierson continued to search Pittelko and the "big and bulky" pocket. Officer Pierson felt a small container that she expressed may be pepper spray. After removing the canister, Officer Pierson discovered it was a can of butane. Another knife was discovered and removed from Pittelko. Pittelko said, "I'm going to jail, aren't I?" Officer Pierson responded "Hey man, we'll discuss it when we get there, ok?" Officer Pierson proceeded to talk to other officers on the scene about her belief that Pittelko was dealing drugs.

Subsequently, Officer Pierson spoke to Pittelko's wife about what had occurred that night and the progression of the investigation. Officer Pierson told Pittelko's wife that drugs had been found on Pittelko and he would probably go to jail that night for charges unrelated to the original domestic investigation. Officer Pierson told the other officers she was unsure what the drugs were that she found on Pittelko, but she would test them at the jail, and she returned to speak to Pittelko.

Officer Pierson informed Pittelko that if he was cooperative, she would "go from there on charges." Officer Pierson read Pittelko his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966) and told him that he was not currently under arrest. Pittelko proceeded to answer questions about the drugs and paraphernalia found on his person. Pittelko admitted that the brown substance was methamphetamine and that he used the pipe to smoke it. Pittelko asked if he could return to his home. Officer Pierson responded that because Pittelko was found in possession of a felony drug, returning home was not an option, but he could help himself if he cooperated with the drug taskforce; Pittelko stated that he did not have information that would be of interest to the taskforce. Officer Pierson began to tell Pittelko "right now you are under arrest for possession of marijuana, paraphernalia . . . ," but Pittelko interrupted her to tell her that although he would be happy to speak with the taskforce, he did not have anything to tell them. Officer Pierson transported Pittelko to jail where he was arrested for possession of a controlled substance (methamphetamine), a

4

felony, and issued citations for possession of a controlled substance (marijuana); possession of drug paraphernalia; and resisting, obstructing, or delaying a police officer, all misdemeanors.

The State charged Pittelko for these offenses and for being a habitual offender. Pittelko filed a motion to suppress, in part arguing that because a search incident to arrest is not reasonable when an arrest is not going to occur, the search of his pocket was unlawful. The district court held a hearing on Pittelko's motion to suppress. At the close of the hearing, the district court noted that, pursuant to *State v. Lee*, 162 Idaho 642, 402 P.3d 1102 (2017), "the search incident to arrest exception does not apply where the evidence shows no arrest was going to occur at the time of the search." The district court found that: Officer Pierson's statements to Pittelko differed from those made by the officer in *Lee*, prior to the discovery of methamphetamine; Officer Pittelko had probable cause to arrest Pittelko for possession of a controlled substance (marijuana), possession of drug paraphernalia, and resisting, obstructing, or delaying an officer; and ultimately the search was reasonable as a search incident to arrest. Accordingly, the district court denied Pittelko's motion to suppress.

Pursuant to a plea agreement, Pittelko entered conditional guilty pleas to felony possession of a controlled substance (methamphetamine), and misdemeanor possession of a controlled substance (marijuana), possession of drug paraphernalia, and resisting, obstructing, or delaying an officer. Pittelko reserved his right to appeal the denial of his motion to suppress. In exchange for Pittelko's guilty pleas, the State dismissed the habitual offender charge. The district court sentenced Pittelko to three years, with one and one-half years determinate, for possession of a controlled substance (methamphetamine). The district court suspended the sentence and placed Pittelko on probation.[2] For the misdemeanors, the district court imposed fourteen days of jail for each charge, with credit for time served. Pittelko timely appeals.

## II.

## STANDARD OF REVIEW

The standard of review of a suppression motion is bifurcated. When a decision on a motion to suppress is challenged, we accept the trial court's findings of fact that are supported by substantial evidence, but we freely review the application of constitutional principles to the facts as found. *State v. Atkinson*, 128 Idaho 559, 561, 916 P.2d 1284, 1286 (Ct. App. 1996). At a

---

[2] Subsequently, Pittelko violated the terms of his probation. The district court revoked Pittelko's probation, imposed the previously suspended sentence, and retained jurisdiction.

5

suppression hearing, the power to assess the credibility of witnesses, resolve factual conflicts, weigh evidence, and draw factual inferences is vested in the trial court. *State v. Valdez-Molina*, 127 Idaho 102, 106, 897 P.2d 993, 997 (1995); *State v. Schevers*, 132 Idaho 786, 789, 979 P.2d 659, 662 (Ct. App. 1999).

## III.

## ANALYSIS

Pittelko alleges that the district court erred in determining that the search of his pocket was a lawful search incident to arrest because when considering the objective facts of the encounter, the totality of the circumstances indicate he would not have been arrested but for Officer Pierson's discovery of methamphetamine during the search. In response, the State argues the district court did not err because the totality of the circumstances, including the objective facts and the subjective intent of the officer, indicate that Pittelko was going to be arrested or was already under arrest prior to the search of his pocket.

A warrantless search is presumptively unreasonable unless it falls within certain special and well-delineated exceptions to the warrant requirement. *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971); *State v. Ferreira*, 133 Idaho 474, 479, 988 P.2d 700, 705 (Ct. App. 1999). A search incident to a valid arrest is among those exceptions and, thus, does not violate the Fourth Amendment proscription against unreasonable searches. *State v. Moore*, 129 Idaho 776, 781, 932 P.2d 899, 904 (Ct. App. 1996). Pursuant to this exception, the police may search an arrestee incident to a lawful custodial arrest. *United States v. Robinson*, 414 U.S. 218, 235 (1973); *Moore*, 129 Idaho at 781, 932 P.2d at 904. The permissible scope and purposes of a search incident to an arrest is not limited to the removal of weapons but includes the discovery and seizure of evidence of crime and articles of value which, if left in the arrestee's possession, might be used to facilitate his escape. *Moore*, 129 Idaho at 781, 932 P.2d at 904.

Two historical rationales justify warrantless searches incident to a lawful arrest; first, the need to disarm the suspect in order to take him into custody and, second, the need to preserve evidence for later use at trial. *Knowles v. Iowa*, 525 U.S. 113, 116 (1998). These rationales recognize that an arrest inherently comes with risks to officer safety from the attendant proximity, stress, uncertainty, *id.* at 117, and extended exposure of the event and a reasonable need to search for and seize any evidence within the arrested person's immediate control to prevent its concealment or destruction. *State v. LaMay*, 140 Idaho 835, 838, 103 P.3d 448, 451 (2004). So

6

long as the search and arrest are substantially contemporaneous[3], and the fruits of the search are not required to establish probable cause for the arrest, the search need not precisely follow the arrest in order to be incident to that arrest. *Lee*, 162 Idaho at 649, 402 P.3d at 1102.

However, a search that precedes an arrest requires "careful scrutiny." *State v. Blythe*, 166 Idaho 713, 718, 462 P.3d 1177, 1182 (2020). To determine whether a search preceding an arrest qualifies as a search incident to an arrest, a court must analyze the totality of the circumstances:

> The reasonableness of a search is determined by the totality of the circumstances, and a search incident to arrest is not reasonable when an arrest is not going to occur. We determine if an arrest is going to occur based on the totality of circumstances, including the officer's statements. While the subjective intent of an officer is usually not relevant in Fourth Amendment analysis, statements made by the officer of his intentions along with other objective facts are relevant in the totality of the circumstances as to whether an arrest is to occur. If an arrest does not occur, and objectively the totality of the circumstances show an arrest is not going to occur, an officer cannot justify a warrantless search based on the search incident to arrest exception.

*Lee*, 162 Idaho at 652, 402 P.3d at 1105. Thus, the trial court may consider both the officer's statements at the time of the incident and the officer's subsequent testimony when determining if an arrest was going to occur. *State v. Budka*, 169 Idaho 180, 186, 492 P.3d 1139, 1145 (Ct. App. 2021).

Ultimately, the threshold inquiry for determining whether a search is incident to a valid arrest is whether the officer has probable cause for the search. *Lee*, 162 Idaho at 649, 402 P.3d at 1102. A warrantless arrest is reasonable and does not violate the Fourth Amendment only if the officer has probable cause to believe that a criminal offense has been or is being committed. *Id.* However, the search incident to arrest exception is not so absolute that it extends to every traffic stop for which there is probable cause to effectuate an arrest. *Blythe*, 166 Idaho at 718, 462 P.3d at 1182. As such, where a search precedes the actual custodial arrest, the Court must determine on a case-by-case basis whether the historical twin rationales of officer safety and evidence preservation were sufficiently present to justify the search. *Id.*

When an officer establishes that she is not going to arrest an individual, even if she has probable cause to do so, she cannot proceed to search the individual pursuant to the search incident

---

[3]    Pittelko does not challenge that the search of his pocket was not sufficiently contemporaneous to the arrest as to qualify as a search incident to arrest; he only argues that the search was not supported by the search incident to arrest exception because an arrest was not going to occur prior to the discovery of methamphetamine.

to arrest exception. *Lee*, 162 Idaho at 650-51, 402 P.3d at 1103-04. In *Lee*, an officer observed Lee driving a truck. *Id.* at 645, 402 P.3d at 1098. The officer learned Lee had a suspended license. *Id.* Lee pulled into a gas station parking lot and entered the store. *Id.* When he exited, Lee began walking down the highway, leaving his pickup truck in the parking lot. *Id.* The officer caught up to Lee and asked him for his driver's license. *Id.* at 645-46, 402 P.3d at 1098-99. Lee patted his pockets and said he did not have it on him. *Id.* The officer told Lee not to pat his pockets. *Id.* When Lee nonetheless continued to pat his pockets, the officer told him to go to the front of the patrol car. *Id.* Lee did not comply and asked the officer "What did I do?" *Id.* The officer responded that he saw Lee driving and knew his license was suspended. *Id.* After Lee eventually complied with the officer's request to stand near the patrol car, the officer proceeded to pat-down frisk Lee for weapons. *Id.* In the process, the officer removed several cylindrical containers and a pocketknife from Lee's pocket. *Id.* The officer handcuffed Lee and told him he was being "detained right now," was "going to get a citation for driving without privileges," and to sit in the back of the patrol car. *Id.* After putting Lee in the patrol car, the officer opened the cylindrical containers, discovered drugs, and arrested Lee for possession of a controlled substance, possession of paraphernalia, and driving without privileges. *Id.*

The Idaho Supreme Court held that the totality of the circumstances made clear an arrest was not going to take place and, therefore, the historical rationales of officer safety and evidence preservation that justify the search incident to arrest exception were no longer present. *Id.* at 651, 402 P.3d at 1104. First, the officer had already frisked Lee for weapons and knew that weapons would not be found in the containers because, based on the officer's experience and training, he immediately recognized that the containers might contain contraband. *Id.* And, second, "all the evidence that was needed to issue Lee a citation for driving without privileges had already been obtained before the search." *Id.* Thus, because the historical rationales justifying the search were no longer present, the Court held the search incident to arrest exception could not justify the officer's search of the containers. *Id.*

Similarly, in *Blythe*, the Supreme Court found that an officer's search of Blythe's shoes was not justified by the search incident to arrest exception because the totality of the circumstances showed the rationales underlying the exception were not present for the search. *Blythe*, 166 Idaho at 719, 462 P.3d at 1183. There, two officers pulled over a car for traffic violations. *Id.* at 714, 462 P.3d at 1178. The officers approached the car, one officer on Parent's side, the driver's side,

and one officer on Blythe's side, the passenger's side. *Id.* An officer noticed a rolled-up dollar bill on Blythe's lap and a roll of tin foil on the floor at Blythe's feet; the officer believed these devices were used to smoke illicit drugs. *Id.* The officer ordered Blythe out of the car, patted him down, and removed items from his pockets, but found nothing of evidentiary value. *Id.* As he removed the items from Blythe's pockets, the officer stated, "Like I said, you know you're not under arrest--nothing like that, right?" *Id.* He told Blythe to stand near the back corner of the car and Blythe complied.

Meanwhile, Parent admitted to the other officer that he had marijuana in the car. *Id.* The officer ordered Parent out of the vehicle, searched him for weapons, found a pill in his shoe, handcuffed him, and ordered him to wait by the hood of the patrol car. *Id.* at 714-15, 462 P.3d at 1178-79. The officers searched the car and found marijuana where Parent said it would be; Parent admitted the marijuana was his. *Id.* at 719, 462 P.3d at 1183. The officers believed they had good reason to search the individuals, and one of the officers preceded to order Blythe to remove his shoes. *Id.* at 715, 462 P.3d at 1179. The officer found heroin in Blythe's shoe and arrested him for possession of a controlled substance. *Id.*

The Supreme Court held that the search of Blythe's shoes was not lawful pursuant to the search incident to arrest exception because the rationales underlying the exception were not sufficiently present to justify the search. *Id.* at 720, 462 P.3d at 1184. First, because there was no indication that an arrest was imminent, Blythe was not subject to the stress and uncertainty of an impending arrest sufficient to give rise to officer safety concerns. *Id.* at 719, 462 P.3d at 1183. Second, while the officers may have had a need to preserve evidence for the traffic violation and possession of marijuana, the Court held that this did not justify the search of Blythe's shoes because: (1) no evidence pertaining to the traffic violation would be found in Blythe's shoes; and (2) Parent freely volunteered to the officers the marijuana's location in his car, the officers searched the car and found the marijuana where Parent said it would be, and Parent admitted the marijuana belonged to him. *Id.* Thus, the Court held the "possibility that additional evidence of Parent's possession of marijuana would be found in Blythe's shoes was remote to non-existent." *Id.* at 719, 462 P.3d at 1183.

Here, the district court did not err by finding the search was made pursuant to the search incident to arrest exception because, in contrast to *Lee* and *Blythe*, the totality of the circumstances indicate that Officer Pierson planned to arrest Pittelko prior to discovering that he was in

9

possession of methamphetamine. First, unlike the officer's explicit statement in *Lee* that Lee would not be arrested for the traffic violation, Officer Pierson's statements concerning not arresting Pittelko were equivocal. Although Officer Pierson initially stated that she would let Pittelko go depending on the results of her investigation of the domestic dispute, she did not repeat this statement after Pittelko admitted to having marijuana on his person. Officer Pierson told Pittelko "marijuana is not a big deal, if I even charge you with it, it is like a misdemeanor. Ok. That's if I decide to charge you with it." Despite Pittelko's argument on appeal, this was not a statement that Officer Pierson would not arrest Pittelko for marijuana possession, regardless of her later decision to issue a citation for the offense. Finally, although Officer Pierson eventually read Pittelko his rights, pursuant to *Miranda*, and told him that he was not currently under arrest, this similarly was not a statement that she would not at some point arrest Pittelko, only that he was not under arrest at that moment.

At the suppression hearing, Officer Pierson explained that she made equivocal statements about whether Pittelko was, or would be, arrested because she wanted to see what information she could obtain before she told him that he was under arrest:

Pittelko's counsel: When you removed the pipe from his pocket, was he under arrest?
Officer Pierson: When he[4] removed the pipe, yes.
Pittelko's counsel: Even though on the video you said he wasn't?
Officer Pierson: At that time, I still wanted to speak to him about what I had located before I made the decisions. He was still detained for those items and I still had PC for arrest, but I wanted to speak to him in regards to the items to give him the chance to tell me about them before.

Accordingly, the district court did not err in finding that Officer Pierson's statements concerning her intent to arrest Pittelko differed from those made by the officer in *Lee*.

Second, a review of the record shows that Officer Pierson's investigation evolved throughout her encounter with Pittelko and, due to this evolving nature, she wanted to conclude the investigation before placing Pittelko under arrest. Although Officer Pierson initially was investigating a domestic dispute, the investigation evolved upon her contact with Pittelko. While patting him down for weapons, Officer Pierson smelled the strong odor of marijuana; Pittelko

---

[4] This Court notes that a review of the body camera footage and Officer Pierson's other testimony indicated Officer Pierson removed the pipe from Pittelko's pocket.

10

admitted to possessing marijuana and directed Officer Pierson to the pocket in which it would be found. Like the officer's search of the car to find the marijuana in *Blythe*, once Pittelko admitted to possessing marijuana in his right front pocket, the search of that pocket to find the marijuana was reasonable. Upon reaching her hand inside of Pittelko's pocket, Officer Pierson felt another object. Officer Pierson testified that she believed, from her training and experience, that what she felt was a glass pipe used to ingest methamphetamine or other illegal narcotics.

Like Pittelko's admission to possessing marijuana, this again changed the course of Officer Pierson's investigation. After discovering the pipe, Officer Pierson told Pittelko that they would "discuss this in a second" and asked him where the rest of the pipe was. Thus, although Officer Pierson did not explicitly say what she meant by "this," from the context, it would seem Officer Pierson was telling Pittelko that they would have a discussion about the drug paraphernalia that she discovered. Officer Pierson continued to search Pittelko's pocket and, after discovering what she believed to be methamphetamine, she again asked where the additional pieces of the pipe were and that Pittelko would be charged if she cut herself on the pieces. In contrast to Pittelko's argument on appeal, this statement did not indicate that she would *only* charge Pittelko for possession of drug paraphernalia if she cut herself on the glass shards. Instead, Officer Pierson stated that Pittelko would be charged with an unspecified offense if she cut herself on the broken pipe.

At the suppression hearing, Officer Pierson explained that the circumstances changed during the course of her interaction with Pittelko, but she wanted to complete the investigation before formally placing Pittelko under arrest:

> State:           Officer, what's the difference between finding a probable cause to arrest and actually making an arrest?
> Officer Pierson: The difference would be whether or not I make the arrest.
> State:           Okay.
> Officer Pierson: I would have--I could have PC for an arrest, but until I completed an investigation I may not officially make an arrest until I've been able to gather statements from people, finish an investigation, give the defendant his chance to provide me with his side of why these things were located on him.
> State:           Okay. You said the situation changed after you finished your search for weapons and you weren't exactly able to--allowed to answer that. Could you answer how the situation changed and why it did?
> Officer Pierson: Yes. As I was patting him for weapons and removing weapons from him, the smell of marijuana, the strong odor coming off of

11

him changed my investigation. It now made me believe that there was another crime that was being committed.

Accordingly, the record does not support Pittelko's assertion that he would have not been arrested but for the discovery of methamphetamine; the record demonstrates the evolving nature of the investigation and Officer Pierson's desire to conclude the investigation prior to placing Pittelko under arrest.

Third, Officer Pierson's statements at the scene and at the suppression hearing support the conclusion that she would have arrested Pittelko even if she had not discovered the methamphetamine. After completing the search, Officer Pierson made several statements that indicated that Pittelko would be arrested; statements that did not limit the possibility of Pittelko's arrest to his possession of methamphetamine. Officer Pierson told Pittelko that he may be going to jail, but the *charges* could be negotiable if he offered cooperation to the drug task force, told his wife that Pittelko would likely go to jail that night for *charges* unrelated to the domestic altercation, and told the other officers that she planned to test the *drugs* found on Pittelko's person at the jail. Finally, after Pittelko told Officer Pierson that he did not have information of interest for the drug task force, Officer Pierson began to verbally place Pittelko under arrest by telling him "right now you are under arrest for possession of marijuana, paraphernalia" before he interrupted her.

And, importantly, Officer Pierson's testimony supports the conclusion that Pittelko would have been arrested even if she had not discovered methamphetamine during the search. During the suppression hearing, Officer Pierson testified that Pittelko was under arrest, or that she intended to arrest him, for possession of a controlled substance (marijuana) and resisting, obstructing, or delaying an officer prior to the search of his pockets:

Pittelko's counsel: Don't--do you recall what you determined on the scene after you had contact with [Pittelko] what you were going to arrest him for?

Officer Pierson: Possession of controlled substance, possession of paraphernalia, possession of controlled substance, marijuana, and resisting and obstructing.

Pittelko's counsel: Well, didn't you say something about asking your sergeant about determining whether you were going to arrest him for resist and obstruct?

Officer Pierson: I wanted to further speak to my sergeant in regards to the use of force.

Pittelko's counsel: So the video where you're talking about whether or not you're going to hook him upon the resist and obstruct after he's been searched, do you remember saying that?

12

Officer Pierson:       Yes.

Pittelko's counsel:   So he wasn't under arrest for resist and obstruct at that point, correct?

Officer Pierson:       It wasn't that he wasn't under arrest. It was that I needed to further speak to my sergeant after he spoke to Mr. Pittelko about the use of force.

The weight given to Officer Pierson's testimony is a credibility determination. The district court expressly found that Officer Pierson was credible in its findings of fact, noting that her testimony was largely corroborated by the body camera footage of the event. This Court will not substitute its view for the view of the trial court as to the credibility of the witnesses, the weight to be given to the testimony, and the reasonable inferences to be drawn from the evidence. *State v. Flowers*, 131 Idaho 205, 207, 953 P.2d 645, 647 (Ct. App. 1998). Thus, because the subjective intent of the officer is relevant, taken together, totality of the circumstances support the district court's conclusion that Pittelko was going to be arrested prior to the discovery of methamphetamine. Accordingly, the district court did not err by finding that Officer Pierson was going to arrest Pittelko prior to the discovery of methamphetamine and, therefore the search was a search incident to arrest.

Next, under the totality of the circumstances, the two rationales underlying the search incident to arrest exception illustrate the justification to search Pittelko's pocket. Assessing the first rationale, the record indicates that officer safety concerns were present throughout the encounter. The district court made the following factual findings, which Pittelko does not challenge on appeal. Officer Pierson responded to a call of a domestic dispute in which Pittelko was threatening to slash his wife's tires. Officer Pierson arrived to a dark scene and an unstable situation, where there was yelling and screaming. Because Pittelko was at least partially concealed behind a car, there was a concern that a crime was in progress. Despite Officer Pierson's repeated commands to Pittelko to come out from behind the car with his hands up and to stop reaching for his knife, Pittelko failed to comply. Because of these circumstances, Officer Pierson believed she needed to use handcuffs to control the situation; Pittelko admitted to having a knife on his person and during the subsequent search of Pittelko, Officer Pierson found two knives. Accordingly, officer safety concerns were sufficiently present during this encounter.

Turning to the second rationale, concerns for evidence preservation support the search of Pittelko's pocket. Unlike in *Lee* and *Blythe*, all the evidence to prosecute had not been obtained prior to the search of Pittelko's pocket. As previously articulated, the district court found Officer

13

Pierson had probable cause to believe that Pittelko was in possession of a controlled substance; she smelled the odor of marijuana on his person and Pittelko admitted to having marijuana in his pocket. Pittelko does not challenge this finding on appeal and, as such, Officer Pierson had sufficient justification to search Pittelko's pockets to locate the marijuana to preserve the evidence of his possession of a controlled substance.

Therefore, when reviewing the circumstances present during the encounter, Officer Pierson's subjective belief that she was going to arrest Pittelko prior to the search of his pocket and discovery of methamphetamine, and the historical rationales underlying the search incident to arrest exception, the search of Pittelko's person falls within the search incident to arrest exception to the Fourth Amendment's warrant requirement. Accordingly, the district court did not err by denying Pittelko's motion to suppress.

## IV.

## CONCLUSION

The search of Pittelko's pocket was a lawful search incident to arrest. Accordingly, the district court did not err in denying Pittelko's motion to suppress and the judgment of conviction is affirmed.

Judge GRATTON and Judge BRAILSFORD **CONCUR**.

14